**Slip Op. 00-64**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____

|  |  |  |
|---|---|---|
| NTN BEARING CORPORATION OF AMERICA, NTN CORPORATION, AMERICAN NTN BEARING MANUFACTURING CORPORATION, NTN DRIVESHAFT, INC. and NTN-BOWER CORPORATION; | : : : : : : : | |
| NSK LTD. and NSK CORPORATION; | : : | |
| KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A., | : : : | |
| Plaintiffs and Defendant-Intervenors, | : : | |
| v. | : : | Consol. Court No. 97-10-01801 |
| UNITED STATES, | : : | |
| Defendant, | : : | |
| and | : : | |
| THE TORRINGTON COMPANY, | : : | |
| Defendant-Intervenor and Plaintiff. | : : | |

_____:

Plaintiffs and defendant-intervenors, NTN Bearing Corporation of America, NTN Corporation, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), NSK Ltd. and NSK Corporation (collectively "NSK"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore[,]*

*Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 61,963 (Nov. 20, 1997). Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain determinations of Commerce's *Final Results*.

Specifically, NTN, NSK and Koyo argue that Commerce erred in conducting a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the seventh administrative review of a 1989 antidumping duty order.

NTN further contends that Commerce erred in: (1) recalculating NTN's United States credit expenses on a transaction-specific rather than on a customer-specific basis for constructed export price ("CEP") sales; (2) denying a price-based, level of trade ("LOT") adjustment to normal value ("NV") under 19 U.S.C. § 1677b(a)(7)(A) for its CEP sales; (3) refusing to accept NTN's reported home market and United States indirect selling expenses based on different trade levels; (4) refusing to calculate CEP profit on a LOT-specific basis; (5) denying a downward adjustment to NTN's reported United States indirect selling expenses for imputed interests incurred in financing cash deposits for antidumping duties; (6) refusing to exclude NTN's reported zero-price sample sales from its United States sales database; (7) failing to adjust NTN's cost of production ("COP") and constructed value ("CV") data on a model-specific basis; (8) including NTN's sales with abnormally high profits and certain home market sample sales from the NV calculation; and (9) excluding certain NTN home market sales to affiliated parties in the NV calculation. NTN, however, claims that Commerce correctly accepted its reported home market discounts as direct price adjustments to NV.

NSK also asserts that Commerce erred in: (1) deducting NSK's United States repacking expenses as direct selling expenses pursuant to 19 U.S.C. § 1677a(d)(1)(B); (2) calculating profit for CV under 19 U.S.C. §§ 1677b(e)(2)(A), 1677(16); and (3) denying a partial, price-based LOT adjustment to NV under 19 U.S.C. § 1677b(a)(7)(A) for CEP sales when matched to its after-market sales in its home market.

Koyo additionally claims that Commerce properly accepted Koyo's reported home market billing adjustments as direct price adjustments to NV.

Commerce responds that it properly: (1) construed 19 U.S.C. § 1675(a)(4) and (c) as authorizing it to conduct a duty absorption inquiry for the subject review; (2) treated NSK's United States repacking expenses as direct selling expenses under 19 U.S.C. § 1677a(d)(1)(B); (3) calculated CV profit; (4) recalculated NTN's United States credit expenses on a transaction-specific basis for CEP sales; (5) denied a LOT adjustment for NTN's CEP sales; (6) interpreted 19 U.S.C. § 1677b(a)(7) as not providing for a partial LOT adjustment for NSK's CEP sales; (7) recalculated NTN's home market and United States indirect selling expenses without regard to LOT, however, since it did not state in the *Final Results* its reasons for recalculating NTN's home market indirect selling expenses, requests that the issue be remanded so it may articulate its reasons for such recalculation; (8) determined NTN's CEP profit without regard to LOT; (9)

denied an adjustment to NTN's reported indirect selling expenses for imputed interests allegedly incurred in financing antidumping duty cash deposits; (10) included NTN's sample sales in its United States sales database; (11) adjusted NTN's COP and CV data; (12) included NTN's sales with abnormally high profits and home market sample sales in the NV calculation; (13) disregarded NTN's affiliated party sales from the NV calculation; and (14) treated Koyo's reported home market billing adjustments and NTN's reported home market discounts as direct price adjustments to NV.

Although Torrington generally agrees with Commerce, it maintains that Commerce erred in accepting Koyo's home market billing adjustments and NTN's alleged home market discounts as direct price adjustments in calculating NV.

**Held:** NTN's, NSK's and Koyo's USCIT R. 56.2 motions are denied in part and granted in part. Torrington's USCIT R. 56.2 motion is denied. The case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review; (2) make adjustments pursuant to 19 U.S.C. § 1677a(c) to § 1677a(a)'s starting price for determining EP; (3) make adjustments pursuant to § 1677a(c) and (d) to § 1677a(b)'s starting price for determining CEP; (4) articulate how the record supports its decision in the *Final Results* to recalculate NTN's home market indirect selling expenses without regard to LOT; (5) clarify how it complied with 19 U.S.C. §§ 1677e, 1677m by using facts available and applying an adverse inference with respect to NTN's alleged zero-price sample sales and, if Commerce determines that it conformed with the statutory framework, to include NTN's sample sales in its United States sales database or, if Commerce determines it did not adhere to all of the statutory prerequisite conditions, to give NTN the opportunity to remedy or explain any deficiency regarding its sample sales; and (6) clarify whether NTN was provided with notice and opportunity to respond pursuant to § 1677m(d) with regard to its COP and CV data.

[NTN's, NSK's and Koyo's USCIT R. 56.2 motions are denied in part and granted in part. Torrington's USCIT R. 56.2 motion is denied. Case remanded.]

Dated: June 5, 2000

*Barnes, Richardson & Colburn* (*Donald J. Unger, Kazumune V. Kano*, *David G. Forgue* and *Christine H.T. Yang*) for NTN.

*Lipstein, Jaffe & Lawson, L.L.P.* (*Robert A. Lipstein*, *Matthew P. Jaffe* and *Grace W. Lawson*) for NSK.

*Powell, Goldstein, Frazer & Murphy LLP* (*Peter O. Suchman*, *Neil R. Ellis*, *Elizabeth C. Hafner*, *Ronald E. Minsk* and *Leigh Fraiser*) for Koyo.

*David W. Ogden*, Acting Assistant Attorney General; *David M. Cohen*, Director, *Velta A. Melnbrencis*, Assistant Director Commercial Litigation Branch, Civil Division, United States Department of Justice; of counsel: *Stacy J. Ettinger*, *Thomas H. Fine*, *Patrick V. Gallagher*, *Myles S. Getlan*, *Rina Goldenberg* and *David R. Mason*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

*Stewart and Stewart* (*Terence P. Stewart*, *James R. Cannon, Jr.*, *Geert De Prest* and *Lane S. Hurewitz*) for Torrington.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs and defendant-intervenors, NTN Bearing Corporation of America, NTN Corporation, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), NSK Ltd. and NSK Corporation (collectively "NSK"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore[,] Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews* ("*Amended Final Results*"), 62 Fed. Reg. 61,963 (Nov. 20, 1997). Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"),

also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain determinations of Commerce's *Final Results*.

NTN, NSK and Koyo argue that Commerce erred in conducting a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for this seventh administrative review of a 1989 antidumping duty order.

NTN also contends that Commerce erred in: (1) recalculating NTN's United States credit expenses on a transaction-specific rather than on a customer-specific basis for constructed export price ("CEP") sales; (2) denying a price-based, level of trade ("LOT" or "LOTs" for "levels of trade") adjustment to normal value ("NV") under 19 U.S.C. § 1677b(a)(7)(A) for its CEP sales; (3) refusing to accept NTN's reported home market and United States indirect selling expenses based on different trade levels; (4) refusing to calculate CEP profit on a LOT-specific basis; (5) denying a downward adjustment to NTN's reported United States indirect selling expenses for imputed interests incurred in financing cash deposits for antidumping duties; (6) refusing to exclude NTN's reported zero-price sample sales from its United States sales database; (7) failing to adjust NTN's cost of production ("COP") and constructed value ("CV") data on a model-specific basis; (8) including NTN's sales with abnormally high profits and certain home market sample sales from the NV calculation; and (9) excluding certain NTN home market sales to affiliated parties in the NV calculation. NTN, however, claims that Commerce correctly accepted its reported home market discounts as direct price adjustments to NV.

Further, NSK asserts that Commerce erred in: (1) deducting NSK's United States

repacking expenses as direct selling expenses pursuant to 19 U.S.C. § 1677a(d)(1)(B); (2)

calculating profit for CV under 19 U.S.C. §§ 1677b(e)(2)(A), 1677(16); and (3) denying a partial,

price-based LOT adjustment to NV under § 1677b(a)(7)(A) for CEP sales when matched to its

after-market sales in its home market.

Koyo also claims that Commerce properly accepted Koyo's reported home market billing

adjustments as direct price adjustments to NV.

Commerce responds that it properly: (1) construed § 1675(a)(4) and (c) as authorizing it

to conduct a duty absorption inquiry for the subject review; (2) treated NSK's United States

repacking expenses as direct selling expenses under § 1677a(d)(1)(B); (3) calculated CV profit;

(4) recalculated NTN's United States credit expenses on a transaction-specific basis for CEP

sales; (5) denied a LOT adjustment for NTN's CEP sales; (6) interpreted § 1677b(a)(7) as not

providing a partial LOT adjustment for NSK's CEP sales; (7) recalculated NTN's home market

and United States indirect selling expenses without regard to LOT, however, since it did not state

in the *Final Results* its reasons for recalculating NTN's home market indirect selling expenses,

requests that the issue be remanded so it may articulate its reasons for such recalculation; (8)

determined NTN's CEP profit without regard to LOT; (9) denied an adjustment to NTN's

reported indirect selling expenses for imputed interests allegedly incurred in financing

antidumping duty cash deposits; (10) included NTN's sample sales in its United States sales

database; (11) adjusted NTN's COP and CV data; (12) included NTN's sales with abnormally

high profits and home market sample sales in the NV calculation; (13) disregarded NTN's

affiliated party sales from the NV calculation; and (14) treated Koyo's reported home market

billing adjustments and NTN's reported home market discounts as direct price adjustments to NV.

Although Torrington generally agrees with Commerce, it maintains that Commerce erred in accepting Koyo's home market billing adjustments and NTN's alleged home market discounts as direct price adjustments in calculating NV.

The Court will address each of these arguments in turn.

## BACKGROUND

On May 15, 1989, Commerce published antidumping duty orders on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported from several countries, including Japan. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan*, 54 Fed. Reg. 20,904. This case concerns the seventh administrative review of the antidumping duty order on AFBs from Japan for the period of review ("POR") covering May 1, 1995 through April 30, 1996. In accordance with 19 C.F.R. § 353.22(c) (1995), Commerce initiated the seventh review on June 20, 1996.[1] *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Duty Administrative Reviews and Notice of Request for*

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law in this case is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan. 1, 1995).

*Revocation of an Order*, 61 Fed. Reg. 31,506 (June 20, 1996). On June 10, 1997, Commerce

published the preliminary results of the seventh review. *See Antifriction Bearings (Other Than*

*Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania,*

*Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty*

*Administrative Reviews and Partial Termination of Administrative Reviews* ("*Preliminary*

*Results*"), 62 Fed. Reg. 31,566. Commerce published the *Final Results* on October 17, 1997, *see*

62 Fed. Reg. at 54,043, and the *Amended Final Results* on November 20, 1997, *see* 62 Fed. Reg.

at 61,963. Oral argument was held on March 8, 1999.


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and

28 U.S.C. § 1581(c) (1994).


## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping

administrative review, the Court will uphold Commerce's determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i) (1994).


### I.      Substantial Evidence Test

"'[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Universal Camera Corp.*

*v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  In reviewing the substantiality of evidence, the Court must take into account the entire record, including "whatever in the record fairly detracts from its weight." *Universal Camera*, 340 U.S. at 488.

**II.     *Chevron* Two-Step Analysis**

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing *Chevron*, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." *Id.* (citations omitted).  "Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." *Id.* (citations omitted); *but see Flora Trade Council v. United States*, 23 CIT __, __, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon") (citation omitted).

If, after employing the first prong of *Chevron*, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. *Chevron*, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided that Commerce has acted reasonably, the Court may not substitute its judgment for the agency's. *See IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (noting that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"). "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." *Mitsubishi Heavy Indus., Ltd. v. United States*, 22 CIT __, __, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

**I.      Commerce's Duty Absorption Inquiry**

**A.      Background**

Title 19, United States Code, § 1675(a)(4) provides that during an administrative review

initiated two or four years after the "publication" of an antidumping duty order, Commerce, if

requested by a domestic interested party, "shall determine whether antidumping duties have been

absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold

in the United States through an importer who is affiliated with such foreign producer or

exporter."[2]  Section 1675(a)(4) further provides that Commerce shall notify the International

Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider

in conducting a five-year ("sunset") review under 19 U.S.C. § 1675(c), and the ITC will take

such findings into account in determining whether material injury is likely to continue or recur if

an order were revoked under § 1675(c).  *See* 19 U.S.C. § 1675a(a)(1)(D).

On May 31, 1996 and July 9, 1996, Torrington requested that Commerce conduct a duty

absorption inquiry pursuant to § 1675(a)(4) with respect to various respondents, including Koyo,

NTN and NSK, to determine whether antidumping duties had been absorbed during the POR.

*See Final Results*, 62 Fed. Reg. at 54,075.

---

[2]  Subsection (a)(4) of 19 U.S.C. § 1675 was added to the antidumping law by the
Uruguay Round Agreements Act ("URAA") in 1994.  *See* Pub. L. No. 103-465, § 220, 108 Stat.
4809, 4860.

In the *Final Results*, Commerce found that duty absorption had occurred for the POR.

*See id.* at 54,044. In asserting authority to conduct a duty absorption inquiry under § 1675(a)(4),

Commerce first explained that for "transition orders," as defined in 19 U.S.C. § 1675(c)(6)(C)

(1994) (that is, antidumping duty orders, *inter alia*, deemed issued on January 1, 1995),

regulation 19 C.F.R. § 351.213(j)(2)[3] provides that Commerce "will make a duty-absorption

determination, if requested, for any administrative review initiated in 1996 or 1998." *See id.* at

54,074 (citing *19 CFR Part 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule*,

62 Fed. Reg. 27,296, 27,394 (May 19, 1997)). Commerce also noted that although the regulation

did not bind it for this seventh AFB review, it constitutes a public statement of how Commerce

---

[3] The full text of 19 C.F.R. § 351.213(j) (1997) provides:

(j) *Absorption of antidumping duties.*

 (1) During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping order under § 351.211, or a determination under § 351.218(d) (sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.
 (2) For transition orders defined in section 751(c)(6) of the Act, the Secretary will apply paragraph (j)(1) of this section to any administrative review initiated in 1996 or 1998.

*Id.*

construes § 1675(a)(4).[4]  *See id.*  Commerce concluded that (1) because the antidumping duty order on the AFBs in this case has been in effect since 1989, the order is a transition order pursuant to § 1675(c)(6)(C), and (2) since this review was initiated in 1996 and a request was made, Commerce had the authority to make a duty absorption inquiry for the seventh POR.  *See id.* at 54,075.

### B.      Contentions of the Parties

Koyo, NSK and NTN argue that:  (1) Commerce lacked authority under § 1675(a)(4) to conduct a duty absorption inquiry for the seventh administrative review of the 1989 antidumping duty order; and (2) even if Commerce possessed the authority to conduct such an inquiry, Commerce's methodology for determining duty absorption was contrary to law and, accordingly, the case should be remanded to Commerce to reconsider its methodology.  *See* Koyo's Mem. Supp. Mot. J. Agency R. at 5-12; NSK's Mem. Supp. Mot. J. Agency R. at 30-34; NTN's Mem. Supp. Mot. J. Agency R. at 28-37.

Commerce argues it properly construed subsections (a) and (c) of § 1675 as authorizing it to make duty absorption inquiries for antidumping duty orders that were issued and published prior to January 1, 1995.  *See* Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R. at 12-20.

---

[4]  Although 19 C.F.R. § 351.213(j) is indicative of Commerce's interpretation of the URAA, the regulation does not apply here because the administrative review in this case was initiated on June 20, 1996 pursuant to a request dated May 31, 1996.  Commerce's regulations that were issued pursuant to the URAA apply only to "administrative reviews initiated on the basis of requests made on or after the first day of July, 1997."  *19 CFR Part 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule*, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997).

Commerce also asserts that it devised and applied a reasonable methodology for determining

duty absorption. *See id.* at 20-28. Torrington generally agrees with Commerce's contentions.

*See* Torrington's Resp. to Pls.' Mots. J. Agency R. at 11-16.


### C.        Analysis

In *SKF USA Inc. v. United States*, 24 CIT __, Slip Op. 00-28 (Mar. 22, 2000), this Court

determined that Commerce lacked statutory authority under 19 U.S.C. § 1675(a)(4) to conduct a

duty absorption inquiry for antidumping duty orders issued prior to the January 1, 1995 effective

date of the URAA. *SKF USA*, 24 CIT at __, Slip Op. 00-28, at 15-22 (citations omitted). The

Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied

prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews." *Id.* at 21 (citing § 291

of the URAA).


Because the duty absorption inquiry, the methodology and the parties' arguments at issue

in this case are practically identical to those presented in *SKF USA*, the Court adheres to its

reasoning in *SKF USA*. The Court, therefore, finds that Commerce did not have the statutory

authority under § 1675(a)(4) to undertake a duty absorption inquiry for the applicable pre-URAA

antidumping duty order in dispute here.

II.     **Commerce's Treatment of NSK's United States**
        **Repacking Expenses as Direct Selling Expenses**

  A.  **Background**

  An antidumping duty is imposed upon imported merchandise when (1) Commerce

determines such merchandise is being dumped, that is, sold or likely to be sold in the United

States at less than fair value ("LTFV"), and (2) the ITC determines that an industry in the United

States is materially injured or is threatened with material injury.  *See* 19 U.S.C. § 1673 (1994); 19

U.S.C. § 1677(34) (1994).  To determine in an investigation or an administrative review whether

there is dumping, Commerce compares the price of the imported merchandise in the United

States to the NV for the same or similar merchandise in the home market.  *See* 19 U.S.C. § 1677b

(1994).  The price in the United States is calculated using either an export price ("EP") or CEP.

*See* 19 U.S.C. § 1677a(a), (b) (1994).

  The Statement of Administrative Action[5] ("SAA") accompanying the URAA clarifies that

Commerce will classify the price of a United States sales transaction as an EP if "the first sale to

an unaffiliated purchaser in the United States, or to an unaffiliated purchaser for export to the

United States, is made by the producer or exporter in the home market prior to the date of

---

  [5]  The Statement of Administrative Action ("SAA") represents "an authoritative
expression by the Administration concerning its views regarding the interpretation and
application of the Uruguay Round agreements."  H.R. Doc. No. 103-316, at 656 (1994).  "[I]t is
the expectation of the Congress that future Administrations will observe and apply the
interpretations and commitments set out in this Statement."  *Id.*; *see also* 19 U.S.C. § 3512(d)
(1994) ("The statement of administrative action approved by the Congress . . . shall be regarded
as an authoritative expression by the United States concerning the interpretation and application
of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question
arises concerning such interpretation or application.").

importation." H.R. Doc. No. 103-316, at 822 (1994). On the other hand, "[i]f, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter," then Commerce will classify the price of a United States sales transaction as a CEP. *See id.*;19 U.S.C. § 1677a(b); *Koenig & Bauer-Albert AG v. United States*, 22 CIT __, __, 15 F. Supp. 2d 834, 850-52 (1998) (discussing when to apply EP or CEP methodology).

Commerce then makes adjustments to the starting price used to establish EP or CEP by adding: (1) packing costs for shipment to the United States, if not already included in the price; (2) import duties which have been rebated or not collected due to exportation of the subject merchandise to the United States; and (3) certain countervailing duties if applicable. *See* 19 U.S.C. § 1677a(c)(1)(A)-(C); SAA at 823. Also, for both EP and CEP, Commerce will reduce the starting price by the amount, if any, included in such price that is attributable to: "(1) transportation and other expenses, including warehouse expenses, incurred in bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States; and (2) . . . export taxes or other charges imposed by the exporting country." *Id.*; *see* 19 U.S.C. § 1677a(c)(2)(A), (B).

Moreover, Commerce must reduce the price used to establish CEP by any of the following amounts associated with economic activities occurring in the United States: (1) commissions paid in "selling the subject merchandise in the United States"; (2) direct selling expenses, that is, "expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties"; (3) "any selling expenses that the seller pays on

behalf of the purchaser" (assumptions); (4) indirect selling expenses, that is, any selling expenses not deducted under any of the first three categories of deductions; (5) certain expenses resulting from further manufacture or assembly (including additional material and labor) performed on the merchandise after its importation into the United States; and (6) profit allocated to the expenses described in categories (1) through (5). 19 U.S.C. § 1677a(d)(1)-(3); *see* SAA at 823-24.

In this case, NSK delivered the subject merchandise to unaffiliated customers in the United States from warehouses owned and operated by NSK. *See* NSK's Resp. to Sect. C Questionnaire, Investigation No. A-588-804, Admin. Rev. 5/1/95-4/30/96, at 38 (Sept. 10, 1996) (Q. 47.0, "U.S. Repacking Cost"). NSK normally ships merchandise in its original containers from its United States warehouse, however, in some instances, it repacked the merchandise to accommodate orders for smaller distributors. *See id.*

For the price of the subject merchandise in the United States, Commerce used EP or CEP, as appropriate, and calculated such prices "based on the packed [free on board], [cost, insurance, and freight], or delivered price to unaffiliated purchasers in, or for exportation to, the United States." *Preliminary Results*, 62 Fed. Reg. at 31,569. Commerce also made deductions for: (1) discounts and rebates; and (2) any movement expenses in accordance with 19 U.S.C. § 1677a(c)(2)(A). *See id.* In calculating CEP, Commerce made additional adjustments in accordance with § 1677a(d)(1)-(3) by: (1) "deducting selling expenses associated with economic activities occurring in the United States, including commissions, direct selling expenses, indirect selling expenses, and repacking expenses in the United States"; (2) "deduct[ing] the cost of any further manufacturing and assembly[,]" where appropriate; and (3) "adjust[ing] for profit

allocated to these expenses." *Id.* In particular, in adjusting CEP, Commerce deducted NSK's

United States repacking expenses as direct selling expenses under § 1677a(d)(1)(B), rather than

as moving expenses under § 1677a(c)(2)(A), because it determined that repacking "was

performed on individual products in order to sell the merchandise to the unaffiliated customer in

the United States. Presumably, if a respondent could have sold the merchandise without

repacking it, the respondent would have done so. Thus, it is an expense associated with selling

the merchandise." *Final Results*, 62 Fed. Reg. at 54,067.


### B.        Contentions of the Parties

NSK argues, as it did in the *Final Results*, *see id.*, that Commerce erred in deducting

NSK's United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B),

*see* NSK's Mem. Supp. Mot. J. Agency R. at 11, 13. According to NSK, the United States

repacking constitutes an expense incident to bringing the subject merchandise from the original

place of shipment in Japan to the place of deliver in the United States and, therefore, should have

been (1) classified and deducted as expense under § 1677a(c)(2)(A), and (2) excluded from the

pool of selling expenses Commerce uses to determine CEP profit. *See id.*; 19 U.S.C. §

1677a(d)(3), (f)(1)(B) (calculating CEP profit based on the profit allocated to expenses described

in § 1677a(d)(1)-(2)).

Specifically, NSK claims that § 1677a(c)(2)(A) is not limited to moving expenses, but

includes expenses required for transporting the goods from NSK's United States warehouses into

the hands of carriers for delivery to United States customers. *See* NSK's Reply Mem. Supp. Mot.

J. Agency R. at 2. NSK asserts that the cost of United States repacking is such a §

1677a(c)(2)(A) expense because the goods cannot be transported unless NSK first breaks open

the transpacific shipping packages, selects the specific items ordered and then repacks those

items for shipment to the customer's United States location. *See id.* at 3-4. NSK clarifies that

this result does not change simply because the United States repacking may be directly related to

particular sales. *See id.* at 3. NSK notes that § 1677a(c)(2)(A) does not preclude the deduction

of expenses directly related to a particular sale; rather, the statute includes "any additional costs,

charges, or expenses," either direct or indirect, incident to bringing the subject merchandise from

Japan to the United States customer. *See id.* (quoting § 1677a(c)(2)(A)). NSK contends, for

instance, United States inland freight from its United States warehouse to United States

unaffiliated customers, even though directly related to particular sales to such customers,

nevertheless constitutes a § 1677a(c)(2)(A) expense. *See id.* Thus, NSK asserts that United

States repacking expenses should similarly be treated as § 1677a(c)(2)(A) expenses even though

it may be directly related to particular sales. *See id.* Finally, NSK claims that United States

repacking does not otherwise meet the definitional criteria of § 1677a(d)(1)(B) direct selling

expenses such as credit expenses, guarantees and warranties. *See id.* NSK notes that such

expenses assist in selling products, but do not involve transporting goods from Japan to the

United States unaffiliated customer as do United States repacking expenses. *See id.*; NSK's

Mem. Supp. Mot. J. Agency R. at 12.

Although agreeing with NSK's contention that United States inland freight (warehouse to

customer) charges are clearly transportation expenses and thus deductible pursuant to

§ 1677a(c)(2)(A), Commerce responds, as it did in the *Final Results*, that NSK's United States repacking expenses bear no relationship to "moving the merchandise from one point to another," as established by the fact that "the merchandise was moved from the exporting country to the United States prior to repacking." Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R. at 29-30 (quoting *Final Results*, 62 Fed. Reg. at 54,067). Commerce also contends that § 1677a(d)(1)(B) does not limit direct selling expenses deducted from CEP to credit expenses, guarantees or warranties; rather, the statute reduces CEP by the amount of any selling expenses which result, and bear a direct relationship to, selling expenses in the United States. *Id.* at 30. Since NSK's repacking was "performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States," Commerce asserts that it properly treated the repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B). *Id.* (quoting *Final Results*, 62 Fed. Reg. at 54,067).

Torrington generally agrees with Commerce's arguments. *See* Torrington's Resp. to Pls. Mots. J. Agency R. at 8, 40-41. Torrington notes, as it did in the *Final Results*, that NSK reported that it normally does not require repacking for its United States sales, but "some repacking 'occurred to accommodate smaller distributor orders.'" *Id.* at 41 (quoting NSK's Resp. to Sect. C Questionnaire, Investigation No. A-588-804, Admin. Rev. 5/1/95-4/30/96, at 38 (Sept. 10, 1996) (Q. 47.0, "U.S. Repacking Cost")). Torrington asserts that since NSK's response is consistent with Commerce's treatment of NSK's repacking expenses as selling rather than movement expenses, Commerce properly included NSK's repacking expenses in its calculation of CEP profit. *See id.*

C.      Analysis

The Court finds that NSK's United States repacking expenses were not incident to

bringing the subject merchandise from the original place of shipment in Japan to the place of

delivery in the United States.  Rather, such expenses were clearly direct selling expenses.

Direct selling expenses under § 1677a(d)(1)(B) are not limited to credit expenses,

guarantees and warranties, but include "expenses which result from and bear a direct relationship

to the particular sale in question."  SAA at 823 (defining direct selling expenses).  In this case,

the particular sales in question concerned orders for smaller distributors.  Although NSK reported

that it normally does not perform repacking for United States sales (that is, it usually ships

merchandise from its United States warehouse in its original containers), NSK acknowledged

that it did some repacking to accommodate orders for smaller distributors.  *See* NSK's Resp. to

Sect. C Questionnaire, Investigation No. A-588-804, Admin. Rev. 5/1/95-4/30/96, at 38 (Sept.

10, 1996) (Q. 47.0, "U.S. Repacking Cost").  The Court finds, therefore, as Commerce did in the

*Final Results*, that NSK's repacking is "expense associated with selling the merchandise."  62

Fed. Reg. at 54,067.

Accordingly, the Court concludes that Commerce properly treated and deducted NSK's

United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B) rather

than as transportation or other expenses pursuant to § 1677a(c)(2)(A).

### III.     Commerce's Calculation of Profit for Constructed Value

####   A.     Background

For this POR, Commerce "used [constructed value] as the basis for NV when there were no usable sales of foreign-like product in the comparison market." *Preliminary Results*, 62 Fed. Reg. at 31,571. Commerce calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994).[6] *See Final Results*, 62 Fed. Reg. at 54,062. In applying the "preferred" method for calculating CV profit under § 1677b(e)(2)(A), Commerce determined that "the use of aggregate data that encompasses all foreign like products under consideration for NV represents a reasonable interpretation of the statute and results in a practical measure of profit that we can apply consistently in each case." *Id.*

####   B.     Contentions of the Parties

NSK contends, *inter alia*, that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to § 1677b(e)(2)(A) and the explicit hierarchy established by 19 U.S.C. § 1677(16) (1994) for selecting the "foreign like product" for the CV profit calculation. *See* NSK's Mem. Supp. Mot. J. Agency R. at 14-17.

---

[6] In calculating constructed value, Commerce is required to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade." 19 U.S.C. § 1677b(e)(2)(A).

Commerce responds, *inter alia*, that it applied a reasonable interpretation of §

1677b(e)(2)(A) and properly based CV profit for NSK on aggregate profit data of all foreign like

products under consideration for NV. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at

30-43. Torrington generally agrees with Commerce. *See* Torrington's Resp. to Pls.' Mots. J.

Agency R. at 20-22.


### C.      Analysis

NSK raised this issue in *RHP Bearings Ltd. v. United States*, 83 F. Supp. 2d 1322 (1999),

which concerned the sixth administrative review of an antidumping duty order on AFBs imported

from the UK. In *RHP Bearings*, this Court held that Commerce's CV profit methodology, which

consists of using the aggregate data of all foreign like products under consideration for NV, is

consistent with the antidumping statute. *See id.* at ___, 83 F. Supp. 2d at 1336. Since NSK's

arguments and the methodology at issue in this case are practically identical to those presented in

*RHP Bearings*, the Court adheres to its reasoning in *RHP Bearings* and, therefore, finds

Commerce's CV profit methodology to be supported by substantial evidence and in accordance

with law.


## IV.    Commerce's Recalculation of NTN's United States
##         Credit Expenses for Constructed Export Price Sales

### A.      Background

In calculating NV, 19 U.S.C. § 1677b(a)(6)(C) directs Commerce to adjust NV to account

for "any differences (or the lack thereof) between the [EP or CEP] and [NV] . . . that is

established to the satisfaction of [Commerce] to be wholly or partly due to . . . differences in the circumstances of sale" ("COS") between sales made in the United States and sales made in the foreign market under consideration. *See* SAA at 828 ("Additional Adjustments to Normal Value"). "Such COS adjustments are made when the seller incurs certain costs in its home market sales that it does not incur when selling to the United States market." *Torrington Co. v. United States*, 156 F.3d 1361, 1363 (Fed. Cir. 1998).

The COS adjustments include adjustments for differences in direct selling expenses such as credit expenses. *See* SAA at 828 ("Commerce will . . . employ the [COS] adjustment to adjust for differences in direct expenses"); *Asociacion Colombiana de Exportadores de Flores v. United States*, 22 CIT __, __, 6 F. Supp. 2d 865, 876 (1998) (discussing COS adjustment for differences in credit costs). A COS adjustment for differences in credit expenses is made to account for the "producer's opportunity cost of extending credit to its customers. By allowing the purchaser to make payment after the shipment date, the producer forgoes the opportunity to earn interest on an immediate payment." *Mitsubishi Heavy Industries, Ltd. v. United States*, 23 CIT __, __, 54 F. Supp. 2d 1183, 1188 (1999). Thus, Commerce uses an imputed credit expense to reflect "the loss attributable to the time value of money." *Id.*; *see Asociacion*, 22 CIT at __, 6 F. Supp. 2d at 876 ("As part of its calculation of selling expenses for U.S. sales, Commerce imputes a credit expense on sales to represent the cost (based upon the time value of money) to the seller of waiting for payment for its sales."). Commerce's normally calculates an imputed credit expense "based only on the cost of financing receivables between shipment date and payment date." *Mitsubishi*, 22 CIT at __, 54 F. Supp. 2d at 1188 (quoting *Mitsubishi Heavy*

*Industries, Ltd. v. United States*, 22 CIT __, __, 15 F. Supp. 2d 807, 820 (1998)).

In this case, NTN calculated its United States credit expense on a customer-specific basis. *See* Verification Report for NTN Corporation (NTN) for the 1995-96 Administrative Review of the Antidumping Duty Order on Antifriction  Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan, A-588-804, Proprietary Doc., at 7 (May 3, 1997) ("Credit Expense").  NTN imputed the cost of credit for sales by determining monthly the average number of days for which each customer's payments were outstanding and the short-term interest rate NTN paid, or would have paid, if it borrowed the same money to finance its accounts receivable. *See id.*

During the review, Torrington contended that Commerce "should recalculate NTN's United States credit expense because . . . reporting credit expense on an average basis may be distortive in cases where not all [United States] sales are dumped." *Final Results*, Fed. Reg. at 54,053.  Torrington noted that NTN provided the necessary information on record to recalculate a credit expense on a "transaction-specific basis." *See id.*

NTN responded that its credit expense should not be recalculated because Commerce had accepted NTN's methodology of reporting a customer-specific average credit expense in all previous AFB reviews. *See id.*; *see, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, et al.; Final Results of Antidumping Duty Administrative Review*, 56 Fed. Reg. 31,692, 31,724 (July 11, 1991) (cross-referenced by *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof*

*From Japan; Final Results of Antidumping Duty Administrative Reviews*, 56 Fed. Reg. 31,754, 31,755 (July 11, 1991)) (Commerce using a customer-specific average credit expense for NTN-Japan during the first review); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews* ("sixth administrative review"), 62 Fed. Reg. 2081, 2101 (Jan. 15, 1997) (Commerce using a customer-specific average credit expense for NTN during this review).

> Commerce agreed with Torrington with regard to CEP sales, finding:
>
> We have data on the record which allows us to calculate transaction-specific credit expense for CEP sales. Therefore, we have recalculated NTN's credit expense using the dates of payment which NTN reported. However, Torrington is incorrect in asserting that NTN reported transaction-specific payment dates for EP sales. NTN does not maintain its payment records in a manner which allows it to provide us with transaction-specific payment dates for EP sales to the United States . . . . Therefore, in these reviews, as in past reviews, we are allowing NTN to calculate its U.S. credit expense for EP sales for each customer on the basis of the average number of days that receivables are outstanding.

*Final Results*, Fed. Reg. at 54,053.

### B.      Contentions of the Parties

NTN notes that Commerce accepted NTN's calculation of credit expenses on a customer-specific basis for the previous six reviews of the antidumping duty order on AFBs from Japan. *See* NTN's Mem. Supp. Mot. J. Agency R. at 14. NTN contends that since "[t]here have been no changes in the facts or law which would compel a sudden shift" in Commerce's practice of accepting credit expenses reported on a customer-specific basis, Commerce's "prior decisions

must become law of the case." *Id.* In support of this contention, NTN relies on *Shikoku*

*Chemicals Corp. v. United States*, 16 CIT 382, 795 F. Supp. 417 (1992), for the proposition that

"[p]rinciples of fairness prevent Commerce from changing its methodology at this late stage . . . .

Adherence to prior methodology is required in some circumstances." NTN's Mem. Supp. Mot. J.

Agency R. at 14 (quoting *Shikoku*, 16 CIT at 388, 795 F. Supp. at 421 (footnote and citations

omitted)). NTN, therefore, requests that the Court remand the issue to Commerce to accept

NTN's customer-specific average credit expense. *See id.*

Commerce asserts that it did not apply any new process and approach in calculating

NTN's United States credit expenses. Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 45.

Rather, Commerce notes that it has expressed, and continues to maintain, a "preference that

expenses be reported on a transaction-specific basis rather than on an average or allocated basis."

*Id.* at 44. However, Commerce claims that when a company's records do not permit transaction-

specific reporting, it has permitted use of average or allocated expenses as it did with NTN's

credit expenses for EP sales. *Id.* Commerce argues that since NTN provided the necessary

information on record which permitted a transaction-specific calculation of NTN's United States

credit expenses for CEP sales, Commerce properly exercised its preference and recalculated the

expenses on such a basis. *See id.* at 45. Also, Commerce contends that the principles of fairness

that prevented Commerce from changing its methodology of calculating an expense at a late

stage in the antidumping proceeding in *Shikoku* are not present in this case. *See id.* at 46.

Torrington agrees with Commerce, noting that, consistent with the antidumping statute and regulations, Commerce has a well-established preference for transaction-specific reporting of expenses. *See* Torrington's Resp. to Pls.' Mots. J. Agency R. at 34. Also, Torrington notes that Commerce's questionnaire requesting information indicated a strong preference for reporting credit expenses on a transaction-specific basis. *See id.* Since the record contained information that permitted more precise credit expense calculations, that is, transaction-specific payment dates for NTN's CEP sales, Torrington contends that Commerce properly recalculated NTN's United States credit expenses on a transaction-specific basis. *See id.* at 34-35.

### C.      Analysis

The Court disagrees with NTN that Commerce is now prohibited from using transaction-specific reporting of NTN's United States credit expense merely because in the past six reviews it accepted customer-specific reporting of such expenses. Commerce does not have to adhere to its customer-specific reporting methodology for calculating credit expenses when a respondent provides the necessary information on record for calculating such expenses on a more accurate and preferred basis, that is, a transaction-specific basis. *See generally NSK Ltd. v. United States*, 19 CIT 1013, ____, 896 F. Supp. 1263, 1275 (1995) (noting that Commerce does not have to "adhere to its prior reporting methodology, especially where Commerce is striving for more accuracy"), *rev'd on other grounds*, 115 F.3d 965 (1997); *see also id.* 19 CIT at ____, 896 F. Supp. at 1275 (explaining that "[d]irect selling expenses are incurred with respect to specific transactions. Credit, for example, is a selling expense which is only incurred when credit is extended under the terms of sale. Because credit expense is a direct expense, it should be tied to

the transaction for which it was incurred.").

Further, NTN's reliance on *Shikoku*, which it cites for the proposition that Commerce must adhere to its prior decisions, is misplaced. *Shikoku* dealt with an attempt by Commerce to adopt a slightly improved allocation methodology of calculating the home market price packing adjustment after years of acceptance of another methodology. *See Shikoku*, 16 CIT at 387, 795 F. Supp. at 420-21. At issue were the fifth and sixth administrative reviews of certain merchandise imported from Japan. *See id.* at 383, 795 F. Supp. at 417-18. The plaintiffs' dumping margins for the previous three consecutive periods of review of sales of the contested merchandise were found to be either *de minimis* or had a margin of zero. *See id.* at 383, 795 F. Supp. at 418. In the fifth and sixth administrative reviews, Commerce altered its allocation methodology for calculating home market packing expenses, resulting in barely above *de minimis* margins and, thereby, Commerce refused a plaintiffs' request to revoke the outstanding antidumping duty order covering the merchandise. *See id.* at 383-84, 795 F. Supp. at 418. Commerce's new calculation was based on information which was requested for the first time at verification. *See id.* at 387, 795 F. Supp. at 421.

The court in *Shikoku* found that: (1) "Commerce [had] employed a new process and approach (both synonyms for 'methodology')" in calculating the home market packing expenses and did not merely apply its standard practice of preferring actual expenses over allocated expenses; (2) Commerce could not demonstrate that the new allocation methodology was an improvement; and (3) the evidence on record established that plaintiffs had relied on Commerce's old methodology for calculating the home market price packing adjustment by

adjusting their prices in accordance with the methodology that Commerce had consistently

applied in prior reviews. *See id.* at 386-87, 795 F. Supp. at 420. Under these circumstances, the

court, noting that "[t]he margin resulting from the new approach . . . is barely above *de minimis*,

determined that it was "simply too late to mandate another three years of administrative reviews

because of a last minute 'improvement' in Commerce's methodology" and concluded that

"Commerce did not have adequate reasons for its last minute change in methodology." *Id.* at

388, 795 F. Supp. at 422.

In this case, however, the Court agrees with Commerce that it did not apply, or switch to,

any new methodology in calculating NTN's credit expenses; instead, Commerce merely

exercised its consistent preference for transaction-specific rather than customer-specific reporting

given that NTN had supplied information which permitted a transaction-specific calculation of

credit expenses. Moreover, in distinct contrast to the facts in *Shikoku*, the Court notes that NTN

was afforded notice of Commerce's preference for transaction-specific reporting. First,

Commerce explicitly gave notice to NTN in the first and second reviews that it prefers to have

the credit expense reported on a transaction-specific basis. *See Antifriction Bearings (Other*

*Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, et*

*al.; Final Results of Antidumping Duty Administrative Review*, 56 Fed. Reg. 31,692, 31,724 (July

11, 1991) (first administrative review) ("The Department prefers to have credit calculated on a

transaction-by-transaction basis. . . . In the future, in keeping with Department practice, credit

expenses should be reported, at a minimum, on a customer-specific basis. In fact, the

Department's preference remains sales-specific reporting of this expense."); *Antifriction*

*Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 28,360, 28,405 (June 24, 1992) (second administrative review) (noting that "the Department will not accept credit expenses not reported, at a minimum, on a customer-specific basis or some reasonable equivalent. In fact, the Department's preference remains for sales-specific reporting of this expense."). Also, as Torrington points out, Commerce's questionnaire for this review specifically reiterated the agency's preferred methodology of using transaction-specific reporting for credit expenses. *See Request for Information, Antifriction Bearings (Other Than Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom* ("Commerce's Questionnaire"), Sec. C, at C-20 (June 19, 1996) (Case No. A-100-001, Fiche 02-03, Frame 03, Pub. Doc. 2) ("This [credit] expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment."). Finally, the Court finds that this case does not present the situation in which, relying upon an old methodology, NTN had actually adjusted its prices and, except for the change in methodology, it would be entitled to a revocation of the outstanding antidumping duty order. Therefore, the principles of fairness that prevented Commerce from changing its methodology in *Shikoku* are not present here.

Accordingly, the Court finds that Commerce's recalculation of NTN's United States credit expense on a transaction-specific basis was supported by substantial evidence and in accordance with law.

V.      **Commerce's Denial of Level of Trade Adjustments to NSK and NTN**

A.      **Background**

1.      **Statutory Provisions**

Under pre-URAA antidumping law, there were no specific provisions providing for an

adjustment to foreign market value ("FMV") for any difference in LOT between United States

price (now EP or CEP) and FMV.  Commerce, however, promulgated a regulation stating that:

(1) it normally would calculate FMV and United States price based on sales at the same

commercial LOT; and (2) if such sales were insufficient to permit an adequate comparison,

Commerce would calculate FMV based on such or similar sales at the most comparable LOT in

the United States market, making appropriate adjustments for differences affecting price

comparability.  *See* 19 C.F.R. § 353.58 (1994); *see generally NEC Home Elecs., Ltd. v. United

States*, 54 F.3d 736, 739 (Fed. Cir. 1995) (discussing 19 C.F.R. § 353.58).

The URAA amended the antidumping statute to provide for a specific provision regarding

adjustments to NV for differences in LOTs.  Instead of FMV, *see* 19 U.S.C. § 1677b (1988), the

statute now provides for NV, *see* URAA § 233(a)(1), 108 Stat. at 4898 (replacing term FMV

with NV), which shall be based on:

> the price at which the foreign like product is first sold (or, in the absence of sale,
> offered for sale) for consumption in the exporting country, in the usual
> commercial quantities and in the ordinary course of trade and, *to the extent
> practicable, at the same level of trade as the export price or constructed export
> price*.

19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added).  The statute also provides for a LOT adjustment

to NV under the following conditions:

    The price described in [§ 1677b(a)(1)(B), *i.e.*, NV,] shall also be increased or
decreased to make due allowance for any difference (or lack thereof) between the
export price and constructed export price and the price described in [§
1677b(a)(1)(B)] (other than a difference for which allowance is otherwise made
under [§ 1677b(a)]) that is shown to be wholly or partly due to a difference in
level of trade between the export price or constructed export price and normal
value, if the difference in level of trade--
        (i) involves the performance of different selling activities; and
        (ii) is demonstrated to affect price comparability, based on a pattern of
        consistent price differences between sales at different levels of trade in the
        country in which normal value is determined.
In a case described in the preceding sentence, the amount of the adjustment shall
be based on the price differences between the two levels of trade in the country in
which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A). In sum, to qualify for a LOT adjustment to NV, a party has the

burden to show that the following two conditions have been satisfied: (1) the difference in LOT

involves the performance of different selling activities; and (2) the difference affects price

comparability. *See* SAA at 829 (stating that "if a respondent claims [a LOT] adjustment to

decrease normal value, as with all adjustments which benefit a responding firm, the respondent

must demonstrate the appropriateness of such adjustment"); *see also NSK Ltd. v. United States*,

190 F.3d 1321, 1330 (Fed. Cir. 1999) (noting that a respondent bears the burden of establishing

entitlement to a LOT adjustment).

      When the available data does not provide an appropriate basis to grant a LOT adjustment,

but NV is established at a LOT constituting a more advanced stage of distribution than the LOT

of the CEP, the statute ensures a fair comparison by providing for an additional adjustment to NV

known as the "CEP offset." *See* 19 U.S.C. § 1677b(a)(7)(B). Specifically, the CEP offset

provides that NV "shall be reduced by the amount of indirect selling expenses incurred in the

country in which normal value is determined on the sales of the foreign like product but not more

than the amount of such expenses for which a deduction is made under [19 U.S.C. §

1766a(d)(1)(D)]." 19 U.S.C. § 1677b(a)(7)(B).


        2.        Commerce's LOT Methodology

During this review, and in several prior reviews, Commerce applied the following LOT

methodology. *See Final Results*, 62 Fed. Reg. at 54,055; *Preliminary Results*, 62 Fed. Reg. at

31,571-72. In accordance with § 1677b(a)(1)(B)(i), Commerce first calculates NV based on

exporting-country (or third-country) sales, to the extent practicable, at the same LOT as the

United States (EP and CEP) sales. *See id.* at 31,571. When Commerce is unable to find

comparison sales at the same LOT as the EP or CEP sales, it compares such United States sales

to sales at a different LOT in the comparison (home or third-country) market. *See id.*

Where the LOT comparison is between NV sales and EP sales (that is, where the first sale

in the United States is to an unaffiliated buyer), Commerce compares the unadjusted, NV starting

price with the starting EP, without making any adjustments to EP as provided for under 19

U.S.C. § 1677a(c). *See id.* at 31,571.

With respect to the LOT methodology for CEP sales, Commerce first calculates CEP by

making adjustments to its starting price under 19 U.S.C. § 1677a(d), but before making any

adjustments under § 1677a(c). *See id.* Commerce reasoned that the § 1677a(d) "adjustments are

necessary to arrive at, as the term CEP makes clear, a 'constructed' EP," that is, it is intended to

reflect as closely as possible a price corresponding to an EP between non-affiliated exporters and

importers.[7] *Final Results*, Fed. Reg. at 54,058. Commerce then determines the LOT for the

"adjusted" CEP sales. *See Preliminary Results*, 62 Fed. Reg. at 31,571.

The next step in its LOT analysis is to determine whether home market sales are at a

different LOT than United States (EP or CEP) sales. *See id.* In making such a determination,

Commerce examines whether the "home market sales are at different stages in the marketing

process than the U.S. [(EP or CEP)] sales," that is, Commerce "review[s] and compare[s] the

distribution systems in the home market and U.S. export markets, including selling functions,

class of customer, and the extent and [LOT] of selling expenses for each claimed [LOT]." *Id.* If

the EP or CEP sales and the NV sales are at a different LOT, and the differences in LOT affects

price comparability, as manifested in a pattern of consistent price differences between the sales

---

[7] In the preliminary results, Commerce explained it reasons for making § 1677a(d), but not
§ 1677a(c), adjustments to the starting price of CEP as follows:

> We calculate the CEP by removing from the first resale to an independent U.S.
> customer the expenses under [19 U.S.C. § 1677a(d)] and the profit associated with
> these expenses. These expenses represent activities undertaken by the affiliated
> importer. As such, they occur after the transaction between the exporter and the
> importer for which we construct CEP. Because the expenses deducted under
> [§ 1677a(d)] represent selling activities in the United States, the deduction of
> these expenses normally yields a different level of trade for the CEP than for the
> later resale (which we use for the starting price). Movement charges, duties and
> taxes deducted under [§ 1677a(c)] do not represent activities of the affiliated
> importer, and we do not remove them to obtain the CEP level of trade.

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France,
Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary
Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative
Reviews*, 62 Fed. Reg. 31,566, 31,571 (June 10, 1997).

on which NV is based and comparison-market sales at the equivalent LOT of the export

transaction, Commerce will make a LOT adjustment under § 1677b(a)(7)(A).  *See id.*  If there is

no pattern of consistent price differences, no adjustment is permitted.  *See id.* at 31,572.  Finally,

for CEP sales, if NV is established at a LOT which constitutes a more advanced stage of

distribution than the LOT of the CEP, and if there is no basis for determining whether differences

in the LOT between NV and CEP affects comparability of their prices, Commerce must make a

CEP offset to NV under § 1677b(a)(7)(B).  *See id.*


### 3.      Denial of LOT Adjustment for CEP Sales

With respect to CEP sales, Commerce found that the same LOT as that of the CEP for

merchandise under review did not exist for any respondent in the home market except for certain

home market sales of respondent NMB/Pelmac.  *See Final Results*, 62 Fed. Reg. at 54,056.

Commerce was unable to "determine whether there was a pattern of consistent price differences

between the [LOTs] based on respondents' [home market] sales of merchandise under review."

*See id.*

In such cases, Commerce looked to alternative methods for calculating LOT adjustments

in accordance with the SAA.  *See id.*  In particular, Commerce noted that the SAA states:

> "if the information on the same product and company is not available, the
> adjustment may also be based on sales of other products by the same company.  In
> the absence of any sales, including those in recent time periods, to different levels
> of trade by the exporter or producer under investigation, Commerce may consider
> the selling experience of other producers in the foreign market for the same
> product or other products."

*Id.* (quoting SAA at 830).  Nevertheless, Commerce determined that it would have been

inappropriate to apply the LOT adjustment calculated for NMB/Pelmac to any other respondent,

reasoning that "[b]ecause no respondent reported sales in the same market as NMB/Pelmac (*i.e.*,

Singapore), we have not used NMB/Pelmac's data as the basis of a level-of-trade adjustment for

any other respondents." *Id.* Consequently, with respect to CEP sales which Commerce was

unable to quantify a LOT adjustment, it granted a CEP offset to respondents, including NTN,

where the home market sales were at a more advanced LOT than the sales to the United States, in

accordance with 19 U.S.C. § 1677b(a)(7)(B). *See id.*

With respect to NSK, Commerce applied a CEP offset to NV for all of NSK's CEP sales.

*See* Antifriction Bearings from Japan–NSK Ltd. (NSK) Preliminary Results Analysis Memo

Seventh Administrative Review 5/1/95-4/30/96 (Mar. 28, 1997) (Case No. A-588-804, Fiche 95,

Frame 57, Pub. Doc. 177, at 59). In reaching this result, Commerce first determined for NSK

that there was one CEP LOT and two home market LOTs, and that the CEP LOT was not the

same as either home market LOT. *See id.* Commerce could not match CEP sales at the same

LOT in the home market or make a LOT adjustment "because the differences in price between

the CEP [LOT] and the home market [LOTs were] not quantifiable due to the lack of an

equivalent CEP level of trade in the home market." *Id.* Commerce concluded that "[b]ecause the

data available do not provide an appropriate basis to determine a [LOT] adjustment and the home

market [LOTs] are at a more advanced stage of distribution than the CEP, [it] made a CEP offset

for all such sales." *Id.* Moreover, contrary to NSK's contentions, Commerce concluded that no

provision of the antidumping statute provides for a "partial" LOT adjustment "between two home

market [LOTs] where neither level is equivalent to the level of the [United States] sale." *Final*

*Results*, 62 Fed. Reg. at 54,057.

### B.       Contentions of the Parties

NTN contends that Commerce improperly denied a price-based LOT adjustment under

§ 1677b(a)(7)(A) for CEP sales made in the United States market at a LOT different from the

home market sales.  *See* NTN's Mem. Supp. Mot. J. Agency R. at 17-18.  In particular, NTN

argues, *inter alia*, that Commerce incorrectly determined NTN's CEP LOT because the agency

failed to use the sale to the first unaffiliated purchaser in the United States to determine NTN's

CEP LOT.  *See id.* at 18-19.  In other words, according to NTN, if Commerce had used the CEP

starting price, that is, without any § 1677a(d) adjustment, to determine CEP LOT, NTN would

have satisfied the statutory requirements for a LOT adjustment for its CEP sales.  *See id.* at 18;

NTN's Reply Br. at 25-31.  In support of its position, NTN cites *Borden Inc. v. United States*, 22

CIT __, 4 F. Supp. 2d 1221 (1998), where the court determined that Commerce's methodology of

making a § 1677a(d) adjustment to CEP prior to the LOT analysis contravened the purpose of §

1677b(a)(7)(A).  *See* NTN's Mem. Supp. Mot. J. Agency R. at 40-42; NTN's Reply Br. at 28-30

(both citing *Borden*, 4 F. Supp. 2d at 1241).  NTN requests that the Court adopt the holding of

*Borden* and remand the LOT issue to Commerce to determine NTN's CEP LOTs prior to any §

1677a(d) deductions and, afterwards, to grant NTN a price-based LOT adjustment for its CEP

sales.  *See id.* at 29-31.

NSK agrees with the manner in which Commerce determined LOT of its CEP for NV

transactions.  *See* NSK's Mem. Supp. Mot. J. Agency R. at 25.  In particular, NSK agrees that

Commerce properly used the CEP as adjusted for § 1677a(d) expenses prior to its LOT analysis. *See id.* at 25 n.12 (stating the Borden court "incorrectly ignored the statutory definition of CEP, which requires certain adjustments to starting price to reach CEP"). NSK, however, argues that Commerce should have granted it a "partial" LOT adjustment. *See id.* at 24-29.

NSK first notes that Commerce found two LOTs in the home market, one corresponding to original equipment manufacturers ("OEM") sales and the other to after market ("AM") sales. *See id.* at 7. NSK also agrees that when Commerce matched CEP sales to home market OEM sales, Commerce correctly applied a CEP offset because there was no basis for quantifying a price-based LOT adjustment for CEP to OEM NV matches. *See id.* at 26. Further, NSK agrees that "Commerce correctly concluded there was no record information that would allow Commerce to quantify the downward price adjustment to adjust fully the AM NV [LOT] to the CEP [LOT]." *Id.* Nevertheless, NSK disagrees with Commerce's decision to apply a CEP offset when Commerce matched CEP sales to home market AM sales. In these situations, NSK argues that § 1677b(a)(7)(A) and the SAA direct Commerce to calculate a partial, price-based LOT adjustment to NV for CEP sales measured by the price differences between OEM and AM LOTs. *See id.* at 8, 26-27.

NSK notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "'wholly or partly due to a difference in level of trade'" between CEP and NV. *Id.* at 26 (quoting § 1677b(a)(7)(A)). NSK also notes that § 1677b(a)(7)(B) indicates a CEP offset should only be used in the total absence of price-based LOT adjustments. *See id.* Accordingly, NSK claims that since there was evidence for quantifying price differences between OEM and

AM LOTs, Commerce's failure to calculate a price-based LOT adjustment that partly accounted for such LOT differences violated the plain language of § 1677b(a)(7)(A). *See* NSK's Reply Mem. Supp. Mot. J. Agency R. at 10-11.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales after deducting expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to § 1677a(d) because § 1677b(a)(7)(A), which provides for a LOT adjustment, requires Commerce to compare CEP, not the "unadjusted" starting price of CEP, with NV. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 57-61. Commerce notes CEP is defined in § 1677a(b) as the price at which the subject merchandise is first sold (or agreed to be sold) in the United States as "adjusted" under § 1677a(d). *See id.* at 58. Commerce further asserts that the Court should not follow *Borden* because it is not based upon persuasive statutory analysis. *See id.* at 61-66. Commerce also claims that it properly denied a LOT adjustment for NTN's CEP sales because NTN failed to establish its entitlement to a LOT adjustment. *See id.* at 5, 66-70.

Commerce also argues that it properly denied a partial LOT adjustment and applied a CEP offset to NV for all of NSK's CEP transactions. *See id.* at 70-77. Contrary to NSK's reading of § 1677b(a)(7)(A), Commerce asserts that the statute only provides for a LOT price-based adjustment to NV based upon price differences in the home market between the CEP LOT and NV LOT when the differences can be quantified. *See id.* at 4, 74-76. Commerce claims that the statute does not authorize a LOT price-based adjustment based upon different LOTs in the home market when the price difference between the CEP LOT sales and the home market LOT sales cannot be quantified, as NTN acknowledges in this case. *See id.*; *see also Final Results*, 62

Fed. Reg. at 54,057 (explaining that Commerce does not read into § 1677b(a)(7)(A)'s "wholly or partly" language the authority to make a LOT adjustment based on differences between two home market LOTs where neither level is equivalent to the level of the United States sale). Commerce, therefore, asserts that since it reasonably interpreted § 1677b(a)(7)(A), the Court should sustain its denial of a LOT adjustment and grant of a CEP offset for all of NSK's CEP transactions. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 76-77.

Torrington generally agrees with Commerce's positions, emphasizing that Commerce: (1) properly denied a LOT adjustment for NTN's CEP sales; (2) correctly made § 1677a(d) adjustments to the starting price of CEP prior to determining a LOT for NTN's CEP sales; and (3) reasonably interpreted § 1677b(a)(7)(A) as not providing for a "partial" LOT adjustment as contended by NSK. *See* Torrington's Resp. to Pls.' Mots. J. Agency R. at 5, 27-29, 41-45. Torrington further argues that even if § 1677b(a)(7)(A) permits a partial LOT adjustment, NSK nevertheless failed to submit record evidence to show entitlement to such an adjustment. *See id.* at 45. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence. *See id.*

### C.    Analysis

Under the first step of *Chevron*, the Court must ascertain whether the antidumping statute's plain language speaks to the precise question at issue. Here, 19 U.S.C. § 1677b(a)(7) specifically provides that to make a LOT adjustment to NV, Commerce must determine if there is "a difference in level of trade between the export price or constructed export price and the

normal value." *Id.* In other words, Commerce must first calculate EP or CEP before performing

its LOT analysis. Title 19, United States Code, § 1677a provides the following guidance for

determining EP and CEP:

> (a) Export price
>
>   The term "export price" means the price at which the subject merchandise is first
> sold (or agreed to be sold) before the date of importation by the producer or
> exporter of the subject merchandise outside of the United States to an unaffiliated
> purchaser in the United States or to an unaffiliated purchaser for exportation to the
> United States, *as adjusted under subsection (c) of this section.*
>
> (b) Constructed export price
>
>   The term "constructed export price" means the price at which the subject
> merchandise is first sold (or agreed to be sold) in the United States before or after
> the date of importation by or for the account of the producer or exporter of such
> merchandise or by a seller affiliated with the producer or exporter, to a purchaser
> not affiliated with the producer or exporter, *as adjusted under subsections (c) and
> (d) of this section.*

*Id.* (emphasis added).[8]

Thus, the starting price under § 1677a(a) must be "adjusted under subsection (c)" of §

1677a to determine EP. Indeed, § 1677a(c)'s language clearly provides that subsection (c)

adjustments must be made to the starting price used to "establish" EP. *See* 19 U.S.C. § 1677a(c)

("The price used to establish export price and constructed export price shall be–(1) increased by .

. . and (2) reduced by"). Similarly, the starting price under § 1677a(b) must be "adjusted under

---

[8]  Although § 1677a does not specifically state that it applies to § 1677b(a)(7), the Court
finds that both sections of "Part IV–General Provisions" of "Subtitle IV–Countervailing and
Antidumping Duties" are to be read together. *See generally Freytag v. Comm'r*, 501 U.S. 868
(1991) (expressing "a deep reluctance to interpret a statutory provision so as to render
superfluous other provisions in the same enactment") (citation and internal quotation marks
omitted).

subsections (c) and (d)" of § 1677a to determine CEP.  Also, the language of § 1677a(c) as well

as § 1677a(d) clearly provides that subsection (c) and (d) adjustments must be made to the

starting price used to "establish" CEP.  *See id.*; 19 U.S.C. § 1677a(d) ("For purposes of this

section, the price used to establish constructed export price shall also be reduced by"); *see also*

*AK Steel Corp. v. United States*, 203 F.3d 1330, 1333 (Fed. Cir. 2000) ("If CEP methodology is

used, additional deductions are taken from the sales price to arrive at the U.S. Price.").  The

Court, therefore, finds that § 1677a unambiguously requires Commerce to make: (1) subsection

(c) adjustments to § 1677a(a)'s starting price to determine EP; and (2) subsection (c) and (d)

adjustments to § 1677a(b)'s starting price to determine CEP.

Accordingly, since the language of § 1677a is unambiguous in how to calculate EP and

CEP, the Court declines to follow the rationale of *Borden*.  *See generally Connecticut Nat'l Bank*

*v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a

statute what it means and means in a statute what it says there.  When the words of a statute are

unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'") (quoting

*Rubin v. United States*, 449 U.S. 424, 430 (1981)); *VE Holding Corp. v. Johnson Gas Appliance*

*Co.*, 917 F.2d 1574, 1579 (Fed. Cir. 1990) ("It is axiomatic that statutory interpretation begins

with the language of the statute.  If . . . the language is clear and fits the case, the plain meaning

of the statute will be regarded as conclusive.") (citations omitted).  Any imbalance that §

1677a's definitions of EP and CEP creates with respect to Commerce's LOT analysis when

comparing NV with EP or CEP must be rectified by Congress because neither the Court nor

Commerce may rewrite the statute.[9]

Further, Commerce's decision to deny NSK a partial, price-based LOT adjustment measured by price difference between home market OEM and AM sales was in accordance with law. There is no indication in § 1677b(a)(7)(A) that the pattern of price differences between two LOTs in the home market, absent a CEP LOT in the home market, justifies a LOT adjustment. Rather, Commerce's interpretation of § 1677b(a)(7)(A) as only providing a LOT adjustment based upon price differences in the home market between the CEP LOT and the NV LOT was reasonable, especially in light of the existence of the CEP offset to cover situations such as those at issue here.

---

[9] Indeed, in *AK Steel Corp. v. United States*, 203 F.3d 1330 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit opined in a related matter:

> Congress's intent to fully define EP and CEP without any delegation to Commerce is further evident when the sections are viewed in the context of the rest of the anti-dumping statute. It is common in the anti-dumping statute for Congress to leave decisions about how to make dumping calculations to Commerce's discretion because of its expertise. . . . Accordingly, if Congress had intended for Commerce to use its discretion to determine whether the use of CEP or EP was appropriate, it would have explicitly left that task to the agency as it did with other calculations in the statute.
>
> When Congress makes such a clear statement as to how categories are to be defined, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition comes to achieving the same result as the statutory definition. The job of revising statutes is for Congress, not the agency or the courts.

*Id.* at 1340-41 (footnote omitted).

**VI.     Commerce's Recalculation of NTN's Home Market and
            United States Indirect Selling Expenses Without Regard to Level of Trade**

> **A.     Background**

In its preliminary calculations, Commerce had calculated NTN's United States indirect

selling expenses without regard to LOTs.  *See Final Results*, 62 Fed. Reg. at 54,055.  NTN

argued that Commerce should have recalculated NTN's United States selling expenses to reflect

its reported indirect selling expense allocations based on LOT.  *See id.*  Torrington, in turn,

contended that Commerce should reject NTN's indirect selling expense allocations based on

LOT because they were distortive and unsubstantiated.  *See id.*

Commerce responded that in the prior four reviews it determined that NTN's

methodology for allocating its indirect selling expenses based on LOTs did not bear any

relationship to the manner in which NTN incurred these United States selling expenses and its

methodology led to distorted allocations.  *See Final Results*, 62 Fed. Reg. at 54,055.  Because

Commerce found during this POR that NTN "did not provide record evidence to substantiate its

claim that its indirect selling expenses are attributable to and vary by its reported levels of trade,"

the agency recalculated NTN's United States indirect selling expenses to represent such selling

expenses for all United States sales.  *Id.*

Commerce also recalculated NTN's home market indirect selling expenses without regard

to LOT, but did not state its reasons for such a recalculation.  *See* Antifriction Bearings from

Japan – NTN Bearing Corporation (NTN), Final Results Analysis Mem. for the Seventh

Administrative Review ("Commerce's Final Results Mem. for NTN") (Sept. 22, 1997) (Case No.

A-588-804, Fiche 254, Frame 1, Proprietary Doc. 88, at 5).


        **B.**        **Contentions of the Parties**

        Although recognizing that in *NTN*, 19 CIT at __, 905 F. Supp. 1083, 1094-95 (1995), the

Court decided against a LOT adjustment for NTN's indirect selling expenses because it failed to

quantify the expenses at each LOT, NTN argues that it submitted evidence that establishes it

incurred different selling expenses at different trade levels for this POR.  *See* NTN's Mem. Supp.

Mot. J. Agency R. at 14-16; NTN's Reply Br. at 19, 22.  NTN also notes that Commerce verified

and found no discrepancies with respect to NTN's home market selling expenses.  *See* NTN's

Mem. Supp. Mot. J. Agency R. at 15.  In particular, NTN notes that Commerce verified that

NTN undertakes different selling functions at each LOT depending upon the class of customer

involved.  *See id.*


        NTN also asserts that it is inconsistent for Commerce to find that there were different

LOTs in the United States and home markets for NTN's subject merchandise while

simultaneously recalculating NTN's United States indirect selling expenses without regard to

LOT.  *See id.* at 16.  NTN notes that Commerce has accepted NTN's methodology of allocating

its United States indirect selling expenses based on LOT in previous reviews and even stated that

NTN's "methodology prevents, rather than creates, certain distortions."  NTN's Reply Br. at 21

(quoting *Tapered Roller Bearings, Finished and Unfinished from Japan; Final Results of

Administrative Review*, 61 Fed. Reg. 57,629, 57,636 (Nov. 7, 1996)).

Accordingly, NTN argues that Commerce should have accepted its reported home market and United States indirect selling expenses based on LOT. NTN's Reply Br. at 19, 22. NTN requests that the Court remand the matter to Commerce and instruct it to recalculate NTN's margins by using NTN's reported indirect selling expense LOT allocations. *See id.*

Commerce responds that NTN's allocation methodology failed to reasonably quantify its United States indirect selling expenses at different trade levels. *See* Def.'s Mem. in Partial Opp'n to Pls.' Mot. J. Agency R. at 48. Commerce asserts that NTN only quantified the allocation itself and, therefore, the Court should sustain the agency's recalculation of NTN's United States indirect selling expenses. *See id.*

Commerce further argues that the mere fact that upon verification it found no discrepancies with respect to NTN's home market indirect selling expenses, does not mean that NTN established that these expenses were incurred at each LOT. *See id.* Moreover, Commerce argues that the fact it may have verified that NTN performed different selling functions depending upon the class of customer involved is insufficient by itself to justify a LOT adjustment for NTN's home market indirect selling expenses because a class of customer does not necessarily correspond to a LOT. *See id.* Commerce asserts, however, that since it did not state on the record its reasons for recalculating NTN's home market indirect selling expenses, the Court should remand the issue so the agency may articulate its reasons for the recalculation. *See id.*

Torrington supports Commerce and argues that NTN has not distinguished the current review from previous reviews in which the Court affirmed Commerce's recalculation of NTN's indirect selling expenses without regard to LOT. *See* Torrington's Resp. to Pls.' Mots. J. Agency R. at 6, 29-33.

## C.       Analysis

The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States indirect selling expenses. Although NTN purports to show that it incurred different selling expenses at different trade levels, a careful review of the record demonstrates that NTN's allocation methodology does not reasonably quantify the United States indirect selling expenses incurred at each LOT to support a LOT adjustment. *See NTN*, 19 CIT at ___, 905 F. Supp. at 1095; *NTN Bearing Corp. of Am. v. United States*, 23 CIT __, __, Slip. Op. 99-71, at __ (July 29, 1999). Given that NTN had the burden before Commerce to establish its entitlement to a LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden of demonstrating that Commerce's denial of the LOT adjustment was not supported by substantial evidence and was not in accordance with law. *See NSK*, 190 F.3d at 1330.

Accordingly, the Court denies NTN's remand request for recalculation of its margins using its reported United States indirect selling expense data. The Court, however, remands this matter to Commerce to articulate how the record supports its decision in the *Final Results* to recalculate NTN's home market indirect selling expenses without regard to LOT.

### VII.    Constructed Export Price Profit Calculation without Regard to Level of Trade

#### A.    Background

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to expenses described in paragraphs (1) and (2)" of § 1677a(d). 19 U.S.C. § 1677a(d)(3). Under 19 U.S.C. § 1677a(f) (1994), the "profit" that will be deducted from this starting price will be "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses." *Id.* § 1677a(f)(1), (2)(A). Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States. Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses." First, "total expenses" will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP. *Id.* § 1677a(f)(2)(C)(i). If Commerce did not request these expenses, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise." *Id.* § 1677a(f)(2)(C)(ii). If the data necessary to determine "total expenses" under either of these methods is not available, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise." *Id.* § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C). *See id.* § 1677a(f)(2)(D).

During this POR, NTN argued that profit levels differed by LOT and had an effect on

prices and CEP profit and, therefore, Commerce should calculate CEP profit on a LOT-specific

basis rather than for each class or kind of merchandise. *See Final Results*, 62 Fed. Reg. at

54,073. NTN reasoned that § 1677a(f)(2)(C) "expresses a preference for CEP profit to be

calculated on the narrowest possible basis which . . . ensures more accurate results." *Id.*

Commerce rejected NTN's argument, concluding that: (1) "neither the statute nor the

SAA requires [Commerce] to calculate CEP profit on bases more specific than the subject

merchandise as a whole"; (2) basing the CEP-profit calculation on a LOT-specific basis "would

add a layer of complexity to an already complicated exercise with no increase in accuracy"; and

(3) "a subdivision of the CEP-profit calculation would be more susceptible to manipulation." *Id.*

at 54,072; *see id.* at 54,073 (Commerce also relied on its more expansive explanation made in the

sixth review of the AFBs at 62 Fed. Reg. 2081, 2125).[10]

---

[10] In the sixth AFB review, Commerce reasoned as follows:

> Neither the statute nor the SAA require us to calculate CEP profit on bases more
> specific than the subject merchandise as a whole. Indeed, while we cannot at this
> time rule out the possibility that the facts of a particular case may require division
> of CEP profit, the statute and SAA, by referring to "the" profit, "total actual
> profit," and "total expenses" imply that we should prefer calculating a single
> profit figure. NTN's suggested approach would also add a layer of complexity to
> an already complicated exercise with no guarantee that the result will provide any
> increase in accuracy. We need not undertake such a calculation (*see Daewoo
> Electronics v. International Union*, 6 F.3d 1511, 1518-19 (CAFC 1993)). Finally,
> subdivision of the CEP-profit calculation would be more susceptible to
> manipulation. Congress has specifically warned us to be wary of such
> manipulation of the profit allocation (*see* S. Rep. 103-412, 103d Cong., 2d Sess at
> 66-67).

(continued...)

## B.    Contentions of the Parties

NTN contends that Commerce erred by refusing to calculate CEP profit on LOT-specific basis. *See* NTN's Mem. Supp. Mot. J. Agency R. at 26. Highlighting the "narrowest category of merchandise" language of § 1677a(f)(2)(C)(ii) and (iii), NTN again argues that there is a clear statutory preference that profit be calculated on the narrowest possible basis. *See id.* at 26-27. Moreover, NTN claims that since CV profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. *See id.* at 27. NTN asserts that the mere fact that a calculation is difficult is not a valid reason to sacrifice accuracy. *See id.* NTN further asserts that Commerce's speculation that an adjustment is susceptible to manipulation provides no grounds for rejecting an adjustment. *See id.* at 28. NTN, therefore, requests that the Court remand the issue to Commerce to calculate CEP profit on a LOT-specific basis. *See id.*

Commerce responds that it properly determined CEP profit without regard to LOT. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 93-98. Commerce notes, *inter alia*, that § 1677a(f) does not refer to LOT, that is, the statute does not require that CEP profit be calculated on a LOT-specific basis. *See id.* at 96. Commerce thereby argues that it does not have to consider a much narrower sub-category of merchandise such as one based on LOT. *See id.* In addition, Commerce asserts that even assuming that a narrower basis for the CEP-profit calculation is warranted in some circumstances, NTN has not provided any factual support for

---

[10](...continued)
*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 2081, 2125 (Jan. 15, 1997).

such a deviation from Commerce's standard methodology for calculating CEP profit. *See id.* at

97. Torrington generally agrees with Commerce's CEP-profit calculation. *See* Torrington's

Resp. to Pls.' Mots. J. Agency R. at 27-29.

### C.     Analysis

Section 1677a(f), as Commerce correctly notes, does not make any reference to LOT.

Accordingly, the Court's duty under *Chevron* is to review the reasonableness of Commerce's

statutory interpretation. *See IPSCO*, 965 F.2d at 1061 (quoting *Chevron*, 467 U.S. at 844).

Subsections (ii) and (iii) of the § 1677a(f)(C)'s "total expense" definition both refer to

"expenses incurred with respect to the narrowest category of merchandise . . . which includes the

subject merchandise." The term "subject merchandise" is defined as "the class or kind of

merchandise that is within the scope of an investigation, a review, a suspension agreement, an

order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act,

1921." 19 U.S.C. § 1677(25) (1994). The statute, therefore, clearly contemplates that, in

general, the "narrowest category" will include the class or kind of merchandise that is within the

scope of an investigation or review.

Accordingly, the Court finds that Commerce reasonably interpreted § 1677a(f) in refusing

to apply a narrower subcategory of merchandise such as one based on LOT. The Court,

moreover, agrees with Commerce's conclusion that "a subdivision of the CEP-profit calculation

would be more susceptible to manipulation," a result that Congress specifically warned

Commerce to prevent. *Final Results*, 62 Fed. Reg. at 54,073 (citing 62 Fed. Reg. at 2125 (Jan.

15, 1997) (citing, in turn, S. Rep. 103-412, 103d Cong., 2d Sess. at 66-67 (1994))).  Finally, even

if the Court were to assume that a narrower basis for calculating CEP profit would be justified

under some circumstances, the Court agrees with Commerce that NTN failed to provide adequate

factual support of how the CEP profit calculation was distorted by Commerce's standard

methodology.


**VIII.   Commerce's Denial of an Adjustment to NTN's United States Indirect Selling Expenses for Interest Allegedly Incurred in Financing Cash Deposits for Antidumping Duties**

**A.      Background**

During the review, NTN claimed a downward adjustment to its reported United States

indirect selling expenses for imputed interest expenses allegedly incurred in financing cash

deposits for antidumping duties.  *See Final Results*, 62 Fed. Reg. at 54,078.  Commerce denied

the adjustment and determined that such an interest offset to NTN's indirect selling expenses is

inappropriate, whether based on actual interest expenses or an imputed amount allegedly

associated with financing cash deposits.  *See id.* at 54,079.  Commerce thereby deducted the

entire amount of NTN's reported indirect selling expenses, including all interest, from the CEP.

*See id.*

Commerce noted that 19 U.S.C. § 1677a(d)(1), which provides for the deduction of

certain selling expenses from CEP that were "incurred by or for the account of the producer or

exporter, or the affiliated seller in the United States, in selling the subject merchandise," does

not precisely define what constitutes a selling expense; instead, Congress has given Commerce

discretionary authority to determine what such an expense encompasses. *See id.* Commerce acknowledged that in past reviews of the applicable antidumping duty orders, it determined that interest expenses incurred in financing antidumping duty cash deposits were not considered selling expenses and thereby allowed an offsetting, financing-cost adjustment to United States indirect selling expenses, "mainly to account for the opportunity cost associated with making a deposit (*i.e.*, the cost of having money unavailable for a period of time)." *Preliminary Results*, 62 Fed. Reg. at 31,569; *see Final Results*, 62 Fed. Reg. at 54,079. For this review, however, Commerce reconsidered its position and concluded that this offsetting financing-cost adjustment is inappropriate. *See id.*

Commerce found that while under the statute it may allow a limited exemption from deductions from United States price for antidumping duty cash deposits and legal fees associated with participation in an antidumping case, it found no basis for extending this exemption to interest expenses allegedly incurred in financing the cash deposits. *See id.* The agency reasoned that there is a distinction "between business expenses that arise from economic activities in the United States and business expenses that are direct, inevitable consequences of the dumping order." *Id.* Commerce determined that while cash deposits and legal fees are incurred solely as a result of the existence of an antidumping order, "[f]inancial expenses allegedly associated with cash deposits are not a direct, inevitable consequence of an antidumping order." *Id.* In particular, Commerce explained that although it may be true that some importers sometimes incur a cost if they borrow money in order to pay for cash deposits of antidumping duties, it is a fundamental principle that:

'money is fungible. If an importer acquires a loan to cover one operating cost, that may simply mean that it will not be necessary to borrow money to cover a different operating cost.' Companies may choose to meet obligations for cash deposits in a variety of ways that rely on existing capital resources or that require raising new resources through debt or equity. For example, companies may choose to pay deposits by using cash on hand, obtaining loans, increasing sales revenues, or raising capital through the sale of equity shares. In fact, companies face these choices every day regarding all their expenses and financial obligations. There is nothing inevitable about a company having to finance cash deposits and there is no way for [Commerce] to trace the motivation or use of such funds even if it were.

*Id.* (quoting *Preliminary Results*, 62 Fed. Reg. at 31,569). Commerce also noted that "the calculation of the dumping margins should not vary depending on whether a party has funds available to pay cash deposits or requires additional funds in the form of loans." *Preliminary Results*, 62 Fed. Reg. at 31,569.

Moreover, Commerce determined that it should not impute an amount for any interest costs that would theoretically be associated with financing actual cash deposits of antidumping duties. *Final Results*, 62 Fed. Reg. at 54,079. Commerce reasoned that "there is no real opportunity cost associated with paying cash deposits when the paying of such deposits is a precondition for doing business in the United States. . . . Companies cannot choose not to pay cash deposits if they want to import nor can they dictate the terms, conditions, or timing of such payments." *Id.*

**B.      Contentions of the Parties**

NTN claims that Commerce's rationale for denying NTN's adjustment for interest

expenses is flawed because irrespective of how a company opts to finance the cash deposits for

antidumping duties, the amount of cash deposited will have to be made up by financing

something else, a result that is a direct inevitable consequence of the antidumping duty order.

*See* NTN's Mem. Supp. Mot. J. Agency R. at 37.  NTN also asserts that if Commerce were to

allow the interest expenses from cash deposits from prior reviews to affect the dumping margin

calculations of present reviews, a never-ending cycle would follow that would prevent

Commerce from ever revoking the antidumping duty order.  *See id.* at 38.

Further, NTN notes that Commerce has repeatedly taken the position that interest

expenses incurred in financing cash deposits of antidumping duties cannot be properly treated as

indirect selling expenses and, therefore, has allowed for an interest-expense adjustment on

antidumping duty cash deposits.  *See id.* at 38 (citations omitted).  NTN asserts that since it has

relied on Commerce's prior methodology for such interest expenses, the holding of *Shikoku*

dictates that Commerce would violate "principles of fairness" if it were allowed to change its

methodology for this POR.  *See* NTN's Reply Br. at 9.

NTN also asserts that this Court has consistently upheld the interest-expense adjustment

to indirect selling expenses when Commerce has granted it and has remanded to Commerce to

allow the adjustment when the agency has denied it.  *See* NTN's Mem. Supp. Mot. J. Agency R.

at 38-39 (citations omitted).  In particular, NTN argues that *Federal-Mogul Corp. v. United*

*States*, 20 CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), clearly refutes Commerce's

decision to deny NTN's interest-expense adjustment.  *See* NTN's Mem. Supp. Mot. J. Agency R. at 39.  In particular, NTN notes the court in *Federal-Mogul* found that there was no support for a domestic party's "assertion that any expense related to antidumping proceedings is automatically a selling expense related to the sale of the subject merchandise.  Indeed, pursuant to the rationale of [*Daewoo Elecs. Co. v. United States*, 13 CIT 253, 270, 712 F. Supp. 931, 947 (1989)], such expenses are not necessarily selling expenses."  NTN's Reply Br. at 8 (quoting *Federal-Mogul*, 20 CIT at __, 950 F. Supp. at 1183).  NTN points out that the court in *Federal-Mogul* found that, similar to the *Daewoo* court's holding that legal expenses related to antidumping proceedings are not selling expenses, the interest expenses at issue did not qualify as selling expenses because they were not related to the sale of merchandise, but to NTN's participation in the antidumping proceeding.  *See id.*  NTN also notes that the court in *Federal-Mogul* held that "'the interest NTN paid for antidumping duty deposits is not a selling expense and, thus, should be excluded from NTN's U.S. indirect selling expenses.'"  NTN's Reply Br. at 8 (quoting *Federal-Mogul*, 20 CIT at __, 950 F. Supp. at 1183).  Moreover, NTN notes that in *NSK Ltd. v. United States*, 21 CIT __, __, 969 F. Supp. 34, 55 (1997), the Court reaffirmed its decision in *Federal-Mogul* to allow NTN's adjustment for interest expenses on antidumping duty cash deposits.  *See* NTN's Mem. Supp. Mot. J. Agency R. at 40.  NTN contends that since there has been no change in law, the issue should be remanded to Commerce to allow NTN to offset its United States indirect selling expenses for imputed interest payments incurred in financing cash deposits.  *See id.* at 12, 40; NTN's Reply Br. at 9.

Commerce argues that its decision to deny the offset was within its discretion.  *See* Def.'s

Mem. in Partial Opp'n to Mot. J. Agency R. at 100. Commerce also argues that it may change its

methodology if it presents a reasonable basis for departing from its previous practice. *See id.* at

100-01. Further, Commerce contends that the interest expenses allegedly incurred with financing

antidumping duty cash deposits are ordinary interest expenses and, therefore, not deductible from

United States indirect selling expenses. *See id.* at 101-02.

Torrington asserts that Commerce reasonably denied the offset, because allowing United

States selling expenses to be reduced in the manner claimed by NTN encourages dumping. *See*

Torrington's Resp. to Pls.' Mots. J. Agency R. at 18-19. Specifically, Torrington argues that the

more a company dumps its merchandise in the United States, the alleged interest expenses on

antidumping duty cash deposits will become greater. *See id.* at 19. Torrington contends that as

the interest expense becomes greater, so does the offset to its reported United States indirect

selling expenses and, indeed, if the offset becomes sufficiently large, dumping margins could

disappear over time. *See id.* Torrington also argues that there is no evidence that NTN actually

obtained loans for the purpose of posting cash deposits and, therefore, there is no factual basis for

the adjustment. *See id.*

C.      Analysis

Although NTN correctly points out that interest expenses incurred on financing antidumping cash deposits are not "selling expenses," *see Federal-Mogul*, 20 CIT at __, 950 F. Supp. at 1183, the Court disagrees that *Shikoku*, 16 CIT at 386-87, 795 F. Supp. at 420, prevents Commerce in this review from altering its methodology of making adjustments to United States indirect selling expenses.  This Court has noted that "Commerce may, in certain circumstances, reasonably change its methodology from review to review." *Timken Co. v. United States*, 21 CIT __, __, 989 F. Supp. 234, 250 (1997) (allowing Commerce to alter its methodology with respect to interest expenses incurred for financing cash deposits).

Consequently, since 19 U.S.C. § 1677a(d) does not provide clear guidance with respect to the adjustment, the issue for the Court is whether Commerce's interpretation of the statute was reasonable.  The Court finds that Commerce reasonably interpreted the statute by concluding that financing expenses incurred on antidumping duty cash deposits are not an inevitable consequence of the antidumping duty order and that, with respect to imputed interest costs, there is no real opportunity cost associated with cash deposits when the paying of such deposits is a precondition for doing business in the United States.  Further, the Court finds that NTN failed to provide any evidence on record that supported it actually or approximately incurred the alleged interest expenses on antidumping duty cash deposits.  Commerce acted rationally in denying NTN's claimed interest-expense adjustment and, therefore, Commerce's determination is sustained.

**IX.    Inclusion of Sample Transactions in NTN's United States Sales Database**

   **A.    Background**

In *NSK Ltd. v. United States*, 115 F.3d 965 (Fed. Cir. 1997), four months prior to

Commerce's publication of the *Final Results*, the United States Court of Appeals for the Federal

Circuit ("CAFC") concluded that "the term 'sold' . . . requires both a transfer of ownership to an

unrelated party and consideration." *Id.* at 975.  The CAFC specifically determined that the

samples NSK had given to potential customers at no charge and with no obligation lacked

consideration.  *See id.*  Moreover, the CAFC found that "[b]ecause NSK's [free] sample sales did

not constitute 'sales,' they should not have been included in calculating United States price." *Id.*


During this review, Commerce sent a questionnaire on June 19, 1996 requiring all

respondents to (1) identify any transactions which they claimed involved sample or prototype

sales, and (2) provide the following additional information:

   (1)    Describe how the order for these sales were communicated.
   (2)    What documents are available to demonstrate that these sales are samples
          or prototypes?
   (3)    Did the customer in question purchase these particular items before the
          date of the claimed sample sale?  If so, how many were purchased?
   (4)    Contrast the prices and quantities involved in these purchases with normal
          sales of these items, if any, to other customers and subsequent sales to the
          same customers.
   (5)    What was the ultimate disposition of these bearings?  Did title pass to the
          recipient of the merchandise? Were the bearings tested and destroyed
          during trial application?

Commerce's Questionnaire, Sec. B (Field No. 49, home or third-country market), Sec. C (Field

No. 55, United States market): Samples and Prototypes, at V-8, V-9.  Commerce warned NTN

that (1) if it failed to accurately provide the information requested within the time period,

Commerce would proceed with an appraisement based on the facts available, and (2) if NTN

failed to cooperate with Commerce by not complying to the best of its ability with the request for

information, Commerce would use information adverse to NTN's interest in conducting its

dumping analysis. *Id.* (General Instructions).

On September 9, 1996, NTN responded to Commerce's Questionnaire regarding United

States market sample sales as follows: (1) customers requested sample sales; (2) sample sales

were reported with a code of "S" and other sales as "X"; (3) the sale was entered as a sample and

recorded as a sample on order forms and invoices; (4) due to the quantity of sample sales and

limited time to respond, NTN did not have time to review each model's purchase history; and (5)

"NTN is the manufacturer of all the merchandise sold as samples."[11]  NTN's Questionnaire

Resp., Sec. C, at C-43 (Case No. A-588-804, Fiche 202, Frame 90, Proprietary Doc. 24).  NTN

further responded that certain information concerning sample sales regarding Commerce's

questions three and four was irrelevant. *See id.* at C-44.

Commerce sent a supplemental questionnaire to NTN requesting additional information,

however, none of the questions appear to have concerned NTN's reported sample sales. *See*

Commerce's Supplemental Questionnaire (Dec. 2, 1996) (Case No. A-588-804, Fiche 85, Frame

26, Pub. Doc. 136).  Similarly, none of NTN's responses to the supplemental questionnaire

addressed the samples. *See* NTN's Supplemental Questionnaire Resp. (Dec. 19, 1996) (Case No.

---

[11]  Although NTN's responses to Commerce's request for information were bracketed as proprietary information, the Court notes that the responses, as paraphrased in this opinion, do not compromise proprietary information.  Quoted response number five (5) was not bracketed as proprietary information.

A-588-804, Fiche 89, Frame 28, Pub. Doc. 149). Commerce later verified that NTN's records

identified certain sales as samples and that the sale price for a sample was determined by a

salesperson. *See* Commerce's Verification Report for NTN (May 8, 1997) (Case No. A-588-804,

Fiche 96, Frame 47, Pub. Doc. 180, at 5).

Subsequently, NTN requested that Commerce exclude its sample sales from its United

States sales database pursuant to *NSK*, 115 F.3d at 975. Commerce rejected NTN's request,

noting that although it would follow *NSK* and "exclude sample transactions, [that is,]

transactions for which a respondent has established that there is either no transfer of ownership or

no consideration, from the dumping [margin] calculations," it would not automatically exclude

from its dumping margin analysis "any transaction to which a respondent applies the label

'sample.'" *Final Results*, 62 Fed. Reg. at 54,069. Rather, Commerce noted that the party in

possession of the needed information has the burden of producing that information for an

exclusion. *See id.* With respect to NTN's samples-exclusion claim, Commerce determined as

follows:

> [NTN] did not answer our questions regarding the purchase history of parties
> receiving samples. [NTN] also did not answer our questions regarding the prices
> and quantities involved in sample sales. Rather, [NTN] stated that the
> information is irrelevant. The answers to these questions would have aided us in
> determining whether [NTN] received a bargained-for exchange from [its United
> States] customers. Lacking knowledge of the details of these transactions, we
> cannot conclude that [NTN] received no consideration for these alleged samples.
> In other words, because [NTN] impeded our investigation of these transactions,
> we determined that an adverse inference is appropriate. Therefore, for these final
> results, we have included [NTN's] sample sales in [its United States] sales
> database.

*Id.*

B.        **Contentions of the Parties**

NTN contends that Commerce acted contrary to *NSK*, 115 F.3d at 975, when it refused to exclude NTN's reported zero-price sample sales from its United States sales database. *See* NTN's Mem. Supp. Mot. J. Agency R. at 23. NTN asserts that sample sales, by their very nature, lack consideration and it in fact received no consideration for such sales. *See id.* Moreover, NTN argues that its response questionnaire and related correspondence (1) provided complete sales data for all United States transactions in its United States sales database, including zero-priced transactions, and (2) fully answered all of Commerce's questions regarding its United States sales. *See* NTN's Reply Br. at 11-12. NTN also argues that none of the information requested by these questions was mentioned by the CAFC in *NSK*. *See id.* at 12. NTN requests that the issue be remanded to Commerce to exclude NTN's zero-priced sample sales from its United States sales database. *See* NTN's Mem. Supp. Mot. J. Agency R. at 23.

Commerce's notes that only NTN possesses the information concerning the purchase history of its alleged samples, including the price and quantity of any prior or subsequent purchases of these products by the same or other consumers. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 86. Commerce asserts that since NTN withheld that information, it failed to meet its burden to show that it received no consideration for the alleged samples at issue. *See id.* Further, Commerce contends that NTN cannot be excused from responding to the agency's questions because, in NTN's view, certain information is irrelevant. *See id.* Rather, Commerce claims that it, not NTN, must determine the relevancy of its questions. *See id.*

Commerce, therefore, contends that since NTN withheld the requested information, and

the record did not contain information that Commerce could use to perform its dumping margin

calculation, Commerce properly relied on "facts otherwise available" to fill in the gaps for its

calculation. *See id.* (citing 19 U.S.C. § 1677e(a) (1994)). Also, Commerce contends that since

NTN failed to cooperate to its best of its ability with Commerce's request for information,

Commerce properly determined to apply an adverse inference, that is, the information would

indicate that NTN did receive consideration for its alleged samples. *See id.* at 86-87 (citing 19

U.S.C. § 1677e(b)). Accordingly, Commerce argues that its decision to include NTN's alleged

sample sales in NTN's United States database is based upon substantial evidence and in

accordance with law. *See id.* at 87.

Torrington agrees with Commerce's findings, contending that the mere absence of a

monetary price does not necessarily establish a lack of consideration. *See* Torrington's Resp. to

Pls.' Mots. J. Agency R. at 26. Moreover, Torrington asserts that since Commerce did not have

information that NTN's sample sales were free of broader forms of consideration, Commerce

properly concluded that it did not have the data to accept NTN's claim that such sales were in

fact without consideration. *See id.* Torrington additionally asserts that respondents, such as

NTN, who choose not to provide the requested information because they determine that the

requested data is not legally relevant do so at their own peril. *See id.*

## C.    Analysis

The antidumping statute mandates that Commerce use "facts  otherwise available"

(commonly referred to as "facts available") if "necessary information is not available on the

record" of an antidumping proceeding. 19 U.S.C. § 1677e(a)(1) (1994). In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e); (3) significantly impedes an antidumping proceeding; and (4) provides information that cannot be verified as provided in section 19 U.S.C. § 1677m(i). *Id.* § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d) (1994).

Section 1677m, which was enacted as part of the URAA, is "designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with [Commerce]." *Borden*, 22 CIT at __, 4 F. Supp. 2d at 1245. Section 1677m(d), entitled "[d]eficient submissions," provides that if Commerce determines that a response to a request for information does not comply with the request, the agency shall promptly inform the person submitting the response of the deficiency and permit that person an opportunity to remedy or explain the deficiency. If the remedial response or explanation provided by the party is found to be "not satisfactory" or untimely, Commerce may, subject to § 1677m(e), disregard "all or part of the original and subsequent responses" in favor of facts available. *Id.* § 1677m(d). Section 1677m(e) states that Commerce may not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all of Commerce's requirements if: (1) the information is submitted within the applicable deadlines; (2) "the information can be verified"; (3) "the information is not so incomplete that it cannot serve as a

reliable basis for reaching the applicable determination"; (4) the party establishes that it acted to

the best of its ability in providing the information and meeting the requirements established by

Commerce concerning the information; and (5) Commerce can use the information without

undue difficulties. *See Borden*, 22 CIT at __, 4 F. Supp. 2d at 1245 ("Subsection (e) may require

use of the respondent's information notwithstanding that a remedy or explanation is

unsatisfactory."). Also, § 1677m(c)(1) provides that if an interested party promptly informs

Commerce that it is having difficulties submitting the information in the requested form and

manner, Commerce may modify its request "to the extent necessary to avoid imposing any

unreasonable burden on that party" in providing such information.

Once Commerce determines that use of facts available is warranted, § 1677e(b) permits

Commerce to apply an "adverse inference" if it can find that "an interested party has failed to

cooperate by not acting to the best of its ability to comply with a request for information." Such

an inference may permit Commerce to rely on information derived from the petition, the final

determination, a previous review or any other information placed on the record. *See* 19 U.S.C. §

1677e(c) (1994). When Commerce relies on information other than "information obtained in the

course of the investigation or review, [Commerce] shall, to the extent practicable, corroborate the

information from independent sources that are reasonably at [its] disposal." *Id.*

However, in order to find that a party "has failed to cooperate by not acting to the best of

its ability," it is not sufficient for Commerce to merely assert this legal standard as its conclusion

or repeat its finding concerning the need for facts available. *See Borden*, 22 CIT at __, 4 F. Supp.

2d at 1246 ("Here, the Department did not make the required additional finding that [respondent]

had failed to act to the best of its ability.  In essence, it simply repeated its 19 U.S.C. §

1677e(a)(2)(B) finding, using slightly different words . . . .") (citation omitted); *Ferro Union,*

*Inc. v. United States*, 22 CIT __, __, 44 F. Supp. 2d 1310, 1329 (1999) ("Once Commerce has

determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make

additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference.").

Rather, to be supported by substantial evidence, Commerce must clearly articulate (1) "why it

concluded that a party failed to comply to the bests of its ability prior to applying adverse facts,"

and (2) "why the absence of this information is of significance to the progress of [its]

investigation." *Ferro*, 22 CIT at __, 44 F. Supp. 2d at 1331.

Although in the first request for information Commerce warned NTN that any lack of

response will result in use of facts available to fill in gaps in the record, the *Final Results* do not

clarify (1) whether NTN was given prompt notice of the deficiency regarding the sample sales

data and given the opportunity to remedy the deficiency, or (2) even if NTN provided a remedial

response, whether Commerce determined that such a response was not satisfactory or untimely,

as required by 19 U.S.C. § 1677m(d).  A review of the record, as noted, indicates that

Commerce's supplemental questionnaire did not request additional information regarding NTN's

reported sample sales. *See* Commerce's Supplemental Questionnaire (Dec. 2, 1996).  Although

Commerce asserted in its brief that NTN met the requirements of 19 U.S.C. § 1677e(a)(2)(A)-

(C), *see* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 82-87, the Court cannot defer to

this *post hoc* rationalization as a basis to uphold Commerce's decision to use facts available

because such a decision must be sustained, if at all, on the same basis as the reasoning articulated

in the final determination itself, *see Hoogovens Staal BV v. United States*, 24 CIT __, __, 86 F. Supp. 2d 1317, 1331 (Jan. 21, 2000) (holding that "a reviewing court must evaluate the validity of an agency's decision on the basis of the reasoning presented in the decision itself. An agency determination 'cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order . . . .'") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept . . . counsel's *post hoc* rationalizations for agency action; . . . an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself.").[12]  Further, even if the Court were to assume that Commerce met § 1677e(a)'s criteria for using facts available, the Court notes that Commerce did not articulate in the *Final Results* whether it made any "additional findings" that NTN had failed to act to the best of its ability before applying an adverse inference under § 1677e(b).

The Court, however, agrees with Commerce's finding that it  should not automatically exclude from its dumping margin analysis "any transaction to which a respondent applies the label 'sample.'" *Final Results*, 62 Fed. Reg. at 54,069.  In determining whether to exclude

---

[12]  Indeed, the Supreme Court has opined:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

*SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) (quoting *United States v. Chicago, M., St. P. & P.R. Co.*, 294 U.S. 499 (1935)).

samples from the sales database, as Commerce correctly noted, it must "examine the information on record to determine whether the recipients of the samples have undertaken actual obligations to purchase AFBs from the provider of the free bearings or whether the recipients remained free to purchase bearings of their own accord." *Id.* This approach is clearly consistent with the CAFC's decision in *NSK*, 115 F.3d at 973-75, where the appellate court determined that a foreign manufacturer's AFB "samples given to potential customers at no charge lacked consideration [because] . . . there is no evidence that potential customers had any obligation regarding samples received from [the manufacturer]. These potential customers were free to transact with [the manufacturer] based solely on their whim." *See id.* at 975 (noting that "[w]hen the promisor may choose to perform based solely on whim, then the promise will not serve as consideration") (citing 3 Williston on Contracts, § 7:7 at 18-19 (4th ed. 1992))). The CAFC explained that "[c]onsideration generally requires a bargain-for exchange," *see id.* (citing 3 Williston on Contracts, § 7:2 at 89 (4th ed. 1992)), and also noted that a "sale" is defined as " 'the act of selling: a contract transferring the absolute or general ownership of property from one person to another for a price (as a sum of money or any other consideration)." *See id.* at 974 (quoting *Webster's Third New International Dictionary* 2003 (1986)). In others words, as Commerce accurately noted in the *Final Results*, consideration, or "price," is not necessarily limited to a "sum of money." *See* 62 Fed. Reg. at 54,069 (stating that Commerce would not limit its "review of consideration to the payment of a monetary price for the sample products").

Accordingly, although NTN argues that none of Commerce's questions in its first request for information were mentioned by the CAFC in *NSK*, 115 F.3d at 973-76, the Court finds that

Commerce may formulate questions that reasonably ascertain whether there was a lack of consideration or transfer of ownership. Also, the Court notes that a respondent still maintains the burden of showing that there is either no consideration or no transfer of ownership to an unrelated party in order to exclude the sample sales from the dumping margin analysis. *See generally Timken Co. v. United States*, 11 CIT 786, 804, 673 F. Supp. 495, 513 (1997) (stating that Commerce "acts reasonably in placing the burden of establishing adjustments on a respondent that seeks the adjustments and that has access to the necessary information").

Nevertheless, in light of the considerable uncertainty left by the *Final Results*, the Court cannot conclude that Commerce's use of adverse facts available was warranted under 19 U.S.C. § 1677e(a). The Court, therefore, remands the issue to Commerce to clarify how it complied with the statutory framework of 19 U.S.C. §§ 1677e, 1677m for using facts available and applying an adverse inference. If Commerce determines that it conformed with the statutory framework, Commerce must include NTN sample sales in its United States sales database because the Court notes that NTN specifically admitted it "sold" rather than gave away samples. *See* NTN's Questionnaire Resp., Sec. C, at C-43 ("NTN is the manufacturer of all the merchandise sold as samples."). If, however, in the remand results Commerce determines it did not adhere to all of the statutory prerequisite conditions, Commerce must give NTN the opportunity to remedy or explain any deficiency regarding its alleged sample sales.

## X.      Commerce's Adjustments to NTN's Cost of Production and Constructed Value

### A.      Background

During the POR, NTN purchased certain components from an affiliated supplier that were used in the manufacture of ball and cylindrical roller bearings. *See* Commerce's Final Results Mem. for NTN at 5. NTN's affiliated producer submitted COP data for certain components sold to NTN. *See* Affiliated Producer's Letter to Commerce (Sept. 9, 1996) (Case No. A-588-804, Fiche 208, Frame 1, Proprietary Doc. 25). Commerce found that "[s]ome of the components NTN purchased from . . . [the] affiliated supplier . . . were transferred at prices below the cost of production." Commerce's Final Results Mem. for NTN at 5. Because Commerce determined that the record was unclear as to which bearing models NTN used the purchased components in, Commerce was unable to adjust NTN's COP and CV data on a model-specific basis. *See id.* Therefore, using "facts otherwise available," Commerce calculated the average percentage difference between the transfer price and the cost for the components sold to NTN by its affiliated supplier. *See id.* at 5-6. Commerce then adjusted NTN's COP and CV upward by this average percentage difference. *See id.* at 6; *Final Results*, 62 Fed. Reg. at 54,065.

### B.      Contentions of the Parties

NTN argues Commerce's adjustment to NTN's COP and CV data was contrary to law because Commerce resorted to facts available and made an adverse inference without giving NTN the opportunity to provide the data Commerce determined was lacking from the record. *See* NTN's Mem. Supp. Mot. J. Agency R. at 19.  Specifically, NTN asserts that Commerce should not have resorted to facts available because: (1) NTN fully responded to Commerce's requests for information and that Commerce at no time indicated that NTN's data was unclear or insufficient, that is, Commerce never asked for clarification of the information NTN submitted, *see id.* at 20; and (2) citing subsections (1) and (2) of 19 U.S.C. § 1677e(a), "NTN did not withhold information, fail to provide information by the deadline or in the manner requested, or impede the investigation in any manner," *id.* at 21.  NTN also notes that Commerce may only make an adverse inference when a "party has failed to cooperate by not acting to the best of its ability." *Id.* at 22 (quoting § 1677e(b)).  NTN, therefore, asserts that since Commerce never asked for any additional information or clarification of the data which was submitted concerning the affiliated supplier's inputs, Commerce is prohibited from making an adverse inference and applying it to all of NTN's COP and CV data.  *See id.*  Accordingly, NTN requests that the Court remand the issue and order Commerce to use NTN's submitted COP and CV data.  *See* NTN's Reply Br. at 25.

Commerce concedes in its brief that NTN did not meet any of the elements under paragraph (2) of the facts available provision, § 1677e(a), that is, "NTN did not withhold information, fail to provide information by the deadline specified or in the manner requested, or

impede the investigation in any manner." *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 79. Nevertheless, Commerce notes that NTN "overlook[ed] paragraph '(1)' of facts available provision, which mandates the use of facts otherwise available "'if the necessary information is not available on the record.'" *Id.* (quoting § 1677e(a)(1)). Commerce argues that when it found the necessary information was not available on the record, it decided to use other information on the record to reflect the fact that NTN purchased certain components from an affiliated supplier that were transferred at prices below the COP. *See id.* at 81. Commerce explained that "the other information on record allowed [it] to adjust NTN's COP and CV without having to reject NTN's reported information in its entirety." *See id.*

Further, Commerce asserts that it did not "determine to make an adverse inference in choosing what information to use as facts available." *Id.* Rather, Commerce reasoned "given that the necessary information was not available on record, [it] used other information to address the problem with NTN's supplier's transfer prices." *Id.* Commerce, therefore, maintains that "[u]nder these circumstances, [its] use of facts available was reasonable." *Id.*

Torrington argues that Commerce properly adjusted all of NTN's COP and CV data for ball and cylindrical roller bearings because "NTN failed to make the record clear at its own peril." Torrington's Resp. to Pls.' Mots. J. Agency R. at 37. Torrington notes that this Court emphasized in *Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 797 F. Supp. 1020 (1992), that "'[u]ltimately it is the respondent's responsibility to make sure that [Commerce] understands, and correctly uses, any information provided by the respondent." *Id.* at 36 (quoting *Neuweg*, 16 CIT at 728, 797 F. Supp. at 1024). Torrington asserts that since NTN "knew what

models reported incorporated the purchased components" from the affiliated supplier, and since

NTN "knew that Commerce would compare transfer prices and actual costs as to such

components, . . . the failure to identify those models incorporating the purchased components

must be charged to NTN, not to Commerce." *Id.*

NTN replies that the facts of this case are distinguishable from *Neuweg* because

Commerce in that case gave the respondent notice of Commerce's problems with the

respondent's submitted information at a disclosure conference soon after the publication of the

preliminary results. *See* NTN's Reply Br. at 23 (citing *Neuweg*, 16 CIT at 728, 797 F. Supp. at

1024). Here, NTN notes that Commerce did not provide any notice and, therefore, it is

inequitable to punish NTN for Commerce's failure to request information. *See id.*

## C.    Analysis

Although Commerce relies on paragraph (1), not (2), of § 1677e(a) for using facts

available, the section requires that Commerce meet the requirements of § 1677m(d) before

resorting to facts available. Section 1677m(d), as noted earlier, states that if Commerce

determines that a response to a request for information does not comply with the request,

Commerce shall promptly inform the respondent submitting the response of the deficiency and

permit the respondent an opportunity to remedy or explain the deficiency.

In this case, the Court finds that the *Final Results* do not clearly articulate whether NTN was provided with such notice and the opportunity to provide a remedial response regarding which ball and cylindrical roller bearing models the purchased components were used in by NTN.  Since there appears to be a lack of § 1677m(d) notice, the Court agrees with NTN that this case is distinguishable from *Neuweg*.  Accordingly, the Court remands the issue to Commerce to clarify whether NTN was provided with notice and opportunity to respond pursuant to § 1677m(d).


XI.     **Commerce's Inclusion of NTN's Alleged Sample Sales and Sales with Abnormally High Profits in the Normal Value Calculation**

A.     **Background**

Commerce is required to base its NV calculation upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  NTN contended during the review that Commerce, in calculating NV, should have excluded sales with "abnormally high" profits because they were outside of the ordinary course of trade.  *See Final Results*, 62 Fed. Reg. at 54,065.  Commerce rejected NTN's contention, explaining as follows:

> [N]o respondent has adequately shown that profits earned were aberrational or abnormal or otherwise outside the ordinary course of trade.  As in past reviews, the fact that a respondent identified sales as having abnormally high profits does not necessarily render such sales outside the ordinary course of trade.  . . . [I]n order to determine that profits are abnormally high, there must be certain unique or unusual characteristics related to the sales in question.  Verification of the designation of certain sales as having abnormally high profits merely proves that the respondent identified sales as having abnormally high profits in its own records.  This evidence does not

indicate that such sales were made outside the ordinary course of trade for
purposes of calculating NV in these reviews.

*See id.* at 54,065-66.


### B.      Contentions of the Parties

In response, NTN argues that Commerce's failure to exclude NTN's sales with unusually

high profits from the NV calculation, despite NTN providing sufficient evidence on record

indicating that these sales were outside of the ordinary course of trade, was inconsistent with 19

U.S.C. § 1677b(a)(1)(B), the SAA and the proposed regulation 19 C.F.R. § 351.102(b) (61 Fed.

Reg. 7308, 7353 (Feb. 27, 1996)), all which clearly instruct Commerce to make such an

exclusion.  *See* NTN's Mem. Supp. Mot. J. Agency R. at 10-11, 23-26; NTN's Reply Br. at 12-

17.  NTN also argues, for the first time on appeal, that Commerce erred in including its home

market sample sales in the calculation of NV because facts on the record support that the sales

were made outside of the ordinary course of trade.  *See* NTN's Mem. Supp. Mot. J. Agency R. at

25-26.  NTN, therefore, requests that its sales with abnormally high profits and samples sales be

disregarded in the calculation of NV.  *See id.* at 26.


Commerce properly exercised its discretion in rejecting NTN's argument that Commerce

must disregard sales with abnormally high profits as sales not in the ordinary course of trade

because "NTN failed to adequately show that profits earned were 'aberrational or abnormal or

otherwise outside of the ordinary course of trade.' " Def.'s Mem. in Partial Opp'n to Mot. J.

Agency R. at 91  (quoting *Final Results*, 62 Fed. Reg. at 54,065).  Commerce further asserts that

the Court should reject NTN's request to exclude sample sales from the NV calculation because

(1) NTN failed to raise the claim at the administrative level; or (2) in the alternative, if NTN is

not required to exhaust its administrative remedies, NTN failed to demonstrate that the samples

were not sold in the ordinary course of trade. *See id.* at 92-93.

Torrington claims that Commerce properly rejected NTN's request to exclude alleged

highly profitable sales and sample sales from the NV calculation because (1) a higher profit on a

particular sale does not establish that a sale is outside the ordinary course of trade, and (2) NTN

failed to show that the contested sales were not in ordinary course of trade. *See* Torrington's

Resp. to Pls.' Mots. J. Agency R. at 27.

### C.     Analysis

The term "ordinary course of trade" is defined as:

> the conditions and practices which, for a reasonable period of time prior to the
> exportation of the subject merchandise, have been normal in the trade under
> consideration with respect to merchandise of the same class or kind. [Commerce]
> shall consider the following transactions, *among others*, to be outside the ordinary
> course of trade:
> > (A) Sales disregarded under section 1677b(b)(1) of this title.
> > (B) Transactions disregarded under section 1677b(f)(2) of this title.

19 U.S.C. § 1677(15) (1994) (emphasis added).  Although § 1677b(b)(1)'s below-cost sales and

§ 1677b(f)(2)'s affiliated party transactions are clearly outside the ordinary course of trade, the

"among others" language of § 1677(15) clearly indicates that transactions in subsection (A) and

(B) are not inclusive.  Indeed, the SAA provides that aside from §§ 1677b(b)(1), (f)(2)

transactions:

> Commerce may consider other types of sales or transactions to  be outside the
> ordinary course of trade when such sales or transactions have  characteristics that

are not ordinary as compared to sales or transactions generally made in the same market. Examples of such sales or transactions include merchandise produced according to unusual product specifications, merchandise sold at aberrational prices, or merchandise sold pursuant to unusual terms of sale. As under existing law, amended section 771(15) does not establish an exhaustive list, but the Administration intends that Commerce will interpret section 771(15) in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results.

SAA at 834. The SAA also provides that "[o]ther examples of sales that Commerce could consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's length prices, and sales with abnormally high profits." *Id.* at 839-40. Thus, Commerce has the discretion to interpret § 1677(15) to determine which sales are outside the ordinary course of trade, such as sales involving aberrational prices and abnormally high profits. *See Mitsubishi Heavy Indus., Ltd. v. United States*, 22 CIT __, __, 15 F. Supp. 2d 807, 830 (1998) ("Congress granted Commerce discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade."); *cf. Koenig & Bauer-Albert AG v. United States*, 22 CIT, __, __, 15 F. Supp. 2d 834, 850 n.8 (1998) (noting that although Commerce has the discretion to decide under what circumstances highly profitable sales are outside of the ordinary course of trade, "Commerce may not impose this requirement arbitrarily, however, nor may Commerce impose impossible burdens of proof on claimants.") (citing *NEC Home Elecs. v. United States*, 54 F.3d 736, 745 (Fed. Cir. 1995) (holding that burden imposed to prove a LOT adjustment was unreasonable because claimant could, under no practical circumstances, meet the burden))).

In this case, the Court finds Commerce's decision to require additional evidence demonstrating that sales with higher profits were outside of the ordinary course of trade before excluding such sales from the NV calculation was a reasonable exercise of its discretion.  The record reflects that NTN did not provide any evidence that supports its claim that the disputed sales had abnormally high profits, that is, they were extraordinary for the market in question. With respect to excluding NTN's home market sample sales from the NV calculation, although, contrary to Commerce's assertion, NTN raised the issue below, *see* NTN's Case Br. at 2-3 (July 1, 1997) (Case No. A-588-804, Fiche 99, Frame 1, Pub. Doc. 204), the Court finds NTN similarly failed to show that the sales were outside the ordinary course of trade.

**XII.    Commerce's Exclusion of Certain NTN Home Market Sales
to Affiliated Parties from the Normal Value Calculation**

**A.    Background**

During the POR, NTN made home market sales to affiliated and unaffiliated parties.  In its preliminary analysis, Commerce conducted an arm's length-test to determine whether NTN's affiliated party sales could be used for purposes of calculating NV.  *See* Commerce's Preliminary Results Analysis Mem. for NTN (June 2, 1997) (Case No. A-588-804, Fiche 97, Frame 48, Pub. Doc. 184); *see generally* SAA at 827 ("Commerce will . . . ignore sales to affiliated parties which cannot be demonstrated to be at arm's length prices for purposes of calculating normal value."). Specifically, Commerce compared NTN's home market selling prices to affiliated and unaffiliated parties for all classes and kinds of merchandise.  *See id.*  Commerce, in accordance with 19 U.S.C. § 1677b(f)(2), "disregarded sales of bearings to certain affiliated parties for

certain classes or kinds of merchandise because [it] found that the net price of these products, when sold to these affiliated parties, was, on average, less than when these products were sold to unaffiliated parties." *Id.* Commerce stated that it "used sales to affiliated customers only where [it] determined that such sales were at arm's-length prices, *i.e.*, at prices comparable to prices at which the firm sold identical merchandise to unrelated customers." *Preliminary Results*, 62 Fed. Reg. at 31,570.

### B.      Contentions of the Parties

NTN argues that Commerce erred in applying the arm's-length test when it refused to use certain NTN sales to affiliated parties in the NV calculation. *See* NTN's Mem. Supp. Mot. J. Agency R. at 42. NTN asserts that Commerce should have examined factors other than price in determining whether affiliated and unaffiliated sales were comparable before disregarding NTN's affiliated party sales from the NV calculation. *See id.* at 42-45; NTN's Reply Br. at 33-35.

Commerce argues that pursuant to 19 C.F.R. § 353.38(c)(1)(ii), (c)(2) (1995), if NTN disagreed with the agency's use of prices in determining whether to use or disregard sales to affiliated customers, NTN was obligated to raise the issue in its case brief to the *Final Results*. *See* Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. at 103. Commerce, therefore, asserts that the Court must reject NTN's untimely argument or, in the alternative, sustain Commerce's arm's-length test because it is supported by substantial evidence and in accordance with law. *See id.* at 104. Torrington generally agrees with Commerce's determination. *See* Torrington's Resp. to Pls.' Mots. J. Agency R. at 37-39.

In response, NTN asserts, *inter alia*, that it would have been futile to raise the issue of looking at factors other than price when determining price comparability at the administrative level because Commerce refused to look at additional factors in prior administrative reviews. *See* NTN's Reply Br. at 35-36.

## C.      Analysis

It is a cardinal principle of administrative law that a court may not consider a party's arguments that were not made before the agency. *See United States v. L.A. Tucker Truck Line*, 344 U.S. 33, 36-37 (1952) ("We have recognized ... that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."). However, a well-recognized exception to the exhaustion of administrative remedies rule is that exhaustion is not required where the efforts of the party would be futile. *See Hormel v. Helvering*, 312 U.S. 552, 557 (1941); *United Black Fund, Inc. v. Hampton*, 352 F. Supp. 898, 902 (D.D.C. 1972) ("[I]t is well settled that an action should not be dismissed for failure to exhaust administrative remedies when an attempt to gain the desired relief from the agency in question would obviously be a futile act."). Also, 28 U.S.C. § 2637(d) grants the Court discretion in deciding when requiring exhaustion is appropriate. *See United States v. Priority Prods., Inc.*, 793 F.2d 296, 300 (Fed. Cir. 1986).

Here, the Court declines to address NTN's arm's-length test issue. Even if it might have been futile for NTN to raise the issue at the administrative level since Commerce refused in the fifth administrative review to consider looking at factors other than price, *see Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 Fed. Reg. 66,472, 66,511 (Dec. 17, 1996) (stating that "regulations direct us to focus on price"), the Court has repeatedly rejected the argument that Commerce should consider additional factors, that is, factors other than price, when determining whether sales prices to affiliated and unaffiliated parties were comparable. The Court also finds no basis under the circumstances of this case to depart from its prior holdings in *NSK Ltd. v. United States*, 21 CIT __, __, 969 F. Supp. 34, 55 (1997) (rejecting "the contention that Commerce should consider other factors (*i.e.*, factors other than price) in determining comparability"), and *NTN Bearing Corp. of Amer. v. United States*, 905 F. Supp. 1083, 1099 (1995) (disagreeing "with NTN that Commerce's arm[']s-length test is flawed because Commerce did not take into account certain factors proposed by NTN"). Accordingly, Commerce's application of its arm's-length test is affirmed.

**XIII.  Commerce's Treatment of Koyo's Home Market Billing Adjustments and NTN's Home Market Discounts as Direct Price Adjustments to Normal Value**

**A.      Background**

In the *Final Results*, Commerce accepted claims discounts, rebates and post-sale price adjustments ("PSPAs") as direct adjustments to price used for calculating NV if it found that the respondent, in reporting these adjustments, "acted to the best of its ability and that its reporting methodology was not unreasonably distortive."  62 Fed. Reg. at 54,049.  Commerce explained that, although it prefers that respondents report the price adjustments on a transaction-specific basis, it recognizes that this is not always feasible, especially given the extremely large number of transactions involved in AFB reviews.  *See id.* at 54,049.  Citing 19 U.S.C. § 1677e, Commerce stated that "it is inappropriate to reject allocations that are not unreasonably distortive in favor of facts otherwise available where a fully cooperating respondent is unable to report the information in a more specific manner."  *Id.*  Commerce, therefore, accepted price adjustments "when it was not feasible for a respondent to report the adjustment on a more specific basis, provided that the allocation method the respondent used [did] not cause unreasonable inaccuracies or distortions."  *Id.*

Further, in applying this standard, Commerce stated that it did not "reject[] a respondent's allocation method solely because the allocation includes adjustments granted on [out-of-scope] merchandise."  *Id.*  Commerce, however, noted that "such allocations are not acceptable where [it] had] reason to believe that respondents did not grant such adjustments in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise."  *Id.*  To determine whether the allocations were granted in proportionate amounts, Commerce "examin[ed] the extent to which

the out-of-scope merchandise included in the allocation pool [was] different from the in-scope merchandise in terms of value, physical characteristics, and the manner in which it is sold," noting that "[s]ignificant differences in such areas may increase the likelihood that respondents did not grant price adjustments in proportionate amounts with respect to sales of in-scope and out-of-scope merchandise." *Id.* Commerce explained that "[w]hile [it] scrutinize[d] any such differences carefully between in-scope and out-of-scope sales in terms of their potential for distorting reported per-unit adjustments on the sales involved in [its] analysis," it recognized that "it would not be reasonable to require that respondents submit sale-specific adjustment data on out-of-scope merchandise in order to prove that there is no possibility for distortion." *Id.* Commerce concluded that "[s]uch a requirement would defeat the purpose of permitting the use of reasonable allocations by a respondent that has cooperated to the best of its ability." *Id.*

In this case, Commerce treated certain home market discounts reported by NTN and certain home market PSPAs reported by Koyo as direct adjustments to NV, as opposed to direct or indirect selling expenses. *See id.* at 54,049-51. With respect to NTN, it reported its discounts separate for each customer and for each class or kind of merchandise. *See* NTN's Resp. Br. Attach. 2 (NTN's Secs. B-D Questionnaire Resp. (Sept. 9, 1996), at B-20). Commerce verified NTN's reported home market discounts and found that NTN granted the discounts on a product- and customer-specific basis, that is, the total discount granted was calculated "'by product for each customer.'" *Final Results*, 62 Fed. Reg. at 54,050. Based on NTN's submitted response, as well as documents reviewed at verification, Commerce concluded that NTN's home market prices should be adjusted to reflect NTN's home market discounts. *See id.*

Commerce also reviewed Koyo's reported home market PSPAs. *See id.* at 54,050-51.

Koyo reported that it granted PSPAs, which it referred to as "billing adjustments," in four

situations: (1) when it had to adjust a preliminary price because it began selling a product to a

customer before negotiating a final price agreement with the customer; (2) when it renegotiated

existing price agreements; (3) when it negotiated lump-sum adjustments with certain customers

without reference to model-specific selling prices; and (4) other adjustments negotiated on a

case-by-case basis. *See* Koyo's Response to Commerce's Questionnaire, Sec. B, at Field 16.1

(Sept. 10, 1996) (Case No. A-588-804, Fiche 66, Frame 1, Pub. Doc. 110, at 15-17). Koyo

placed these billing adjustments in one of two categories. *See id.* at 16-17.

First, Koyo designated as "billing adjustment one" (BILADJ1H) those adjustments that

were allocated over only in-scope merchandise and were "granted on a model-specific basis, [but

were] calculated and reported . . . on a customer-specific basis (*i.e.*, on the basis of all AFB sales

to that customer) because of the tremendous volume of reported sales." *See* Koyo's Response to

Commerce's Supplemental Questionnaire, Sec. A-D (Jan. 13, 1997) (Case No. A-588-804, Fiche

92, Frame 19, Pub. Doc. 157, at 11). Koyo designated as "billing adjustment two" (BILADJ2H)

those adjustments which were allocated over in-scope and out-of-scope merchandise and were

either granted on: (1) a lump-sum basis which it negotiated with its customers without reference

to model-specific selling prices, or (2) a model-specific basis, but which Koyo reported on a

customer-specific basis because no computerized model-specific information was maintained.

*See* Koyo's Response to Commerce's Questionnaire at 17. Billing adjustment two was reported

by determining, on a customer-specific basis, the proportion of such adjustments attributable to

in-scope merchandise. *See id.* In other words, the only difference between billing adjustment

one and billing adjustment two, both of which involved customer-specific allocations, was that

billing adjustment one was free from out-of-scope merchandise, while billing adjustment two

relied on an allocation to remove the effect of any out-of-scope merchandise.

In accepting Koyo's reporting methodology for billing adjustment one, Commerce

determined that "while Koyo has paper records of the adjustment, it is not feasible for Koyo to

retrieve the information electronically or to allocate this adjustment more specifically, given the

large volume of transactions involved, the level of detail contained in Koyo's normal accounting

records, and the time constraints imposed by the statutory deadlines under which all parties must

operate." *Final Results*, 62 Fed. Reg. at 54,051. Similarly, Commerce accepted Koyo's

reporting methodology for billing adjustment two after concluding that: (1) "Koyo acted to the

best of its ability in reporting this information using customer-specific allocations"; (2) "it was

not feasible for Koyo to report this adjustment on a more specific basis" given that "Koyo's

records do not readily identify a discrete group of sales to which each billing adjustment pertains

and the extremely large number of POR sales Koyo made"; and (3) "Koyo's allocation

methodology . . . was not distortive." *Id.*

**B.**     **Contentions of the Parties**

Torrington contends that Commerce's acceptance of Koyo's reported home market billing adjustments as direct price adjustments was unlawful and not supported by substantial evidence because such adjustments must be reported on a sales-specific basis. *See* Torrington's Mem. Supp. Mot. J. Agency R. at 2. In particular, Torrington argues that Koyo's reported methodology of allocating adjustments on a customer-specific basis contravene's the CAFC's rationale in *Torrington Co. v. United States* ("*Torrington CAFC*"), 82 F.3d 1039 (Fed. Cir. 1996), because Koyo failed to show that all of its reported home market billing adjustments were directly related to relevant sales. *See id.* at 2. Torrington notes that *Torrington CAFC* followed prior CAFC cases to define "direct adjustments to price [as] ... expenses which vary with the quantity sold . . . or that are related to a particular sale." *Id.* at 10 (internal quotations and citations omitted). Torrington also notes that Commerce had properly followed the CAFC's approach in the fifth administrative review, whereby the agency stated that the proper approach is to accept claims for price adjustments "'as direct adjustments to price if actual amounts are reported for each transaction [and] ... [accept] price adjustments based on allocations [only if] ... they are based on a fixed and constant percentage of sales price.'" *Id.* at 11 (quoting *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews* ("fifth administrative review"), 61 Fed. Reg. 66,472, 66,498 (Dec. 17, 1996)).

Torrington claims that in this review as well as the sixth review, however, Commerce

"abandoned" the approach taken by the CAFC.  *See id.* at 12.  As a result, Commerce unlawfully

redefined what the CAFC considered "direct" by adopting a new methodology.  *See id.*

According to Torrington, Commerce's new methodology allowed Koyo to report allocated

PSPAs if Koyo acted to the best of its ability in view of its record keeping system and the results

were not unreasonably distortive.  *See id.*  Relying on *Lechmere, Inc. v. Nat'l Labor Relations*

*Bd.*, 502 U.S. 527 (1992), Torrington maintains that Commerce's new methodology is unlawful

since it ignores the well-settled definition of "direct" adjustments to price enunciated by the

CAFC.  *See id.* at 12-13.  Torrington further asserts that although the fifth administrative review

and *Torrington CAFC* pre-date the URAA amendments, "[t]he new statute retains the distinction

between 'direct' and 'indirect' expenses and Congress gave no indication that changes in

meanings were ever intended."  *Id.* at 13-14 (citation omitted).  Torrington, therefore, argues that

since Commerce's new methodology must conform with precedent, this Court should review

Koyo's home market PSPAs by applying the rationale of *Torrington CAFC*.  *See* Torrington's

Mem. Supp. Mot. J. Agency R. at 15.

Torrington recognizes that this Court approved the new methodology used by Commerce

in *Timken Co. v. United States* ("*Timken*"), 22 CIT __, 16 F. Supp. 2d 1102 (1998), on the

grounds that "the new [methodology] allowed a more flexible response, reflecting the 'more

lenient statutory instructions of [19 U.S.C. § 1677m(e)].'"  *Id.* at 16 (quoting *Timken*, 16 F. Supp.

2d at 1108).  Nevertheless, Torrington maintains, *inter alia*, that the Court should reconsider its

position in *Timken* because § 1677m(e), while reflecting Congress's intent for Commerce to be

more flexible regarding certain essential information submitted by respondents, "does not affect

Commerce's fundamental policy, consistently approved by the courts, of putting the burden of

proof with the party who intends to benefit from the claim made." *Id.* As such, Torrington

maintains that even if Commerce's new, but erroneous methodology was applied to the instant

case, Koyo did not carry its burden of proof in establishing entitlement to any advantageous

adjustment. *See id.* at 18. Specifically, Torrington claims that Koyo failed to demonstrate that its

reported home market billing adjustment allocations were not distortive and that it acted to the

best of its ability (that is, made its best efforts) in reporting the claimed adjustment amounts. *See

id.* at 18-19. Torrington notes, for instance, Commerce in the *Final Results* "failed to directly

address whether Koyo 'acted to the best of its ability'" in reporting billing adjustment one. *Id.* at

19.

Torrington additionally asserts that Koyo did not provide substantial evidence to prove

that it used its best efforts to make adjustments on as specific a basis as possible. *See id.* at 20.

Rather, Torrington notes that Commerce merely excused more precise reporting by Koyo on the

grounds that it was not feasible for Koyo to allocate the adjustment on a more specific basis

because of the large number of sales at issue, the level of detail involved in Koyo's accounting

records, and the time constraints imposed by statutory deadlines. *See id.* at 20-21 (citing *Final

Results*, 62 Fed. Reg. at 54,051). Torrington also contends that Koyo's argument of infeasibility

in undertaking more specific reporting is invalid because Koyo could have modified its

accounting system in order to arrive at more precise data. *See id.* at 21. Moreover, Torrington

asserts that aside from what was or was not possible, Koyo did not provide evidence on record to

demonstrate that it was infeasible or inconvenient to provide more specific reporting and,

therefore, there is "nothing objective for [the] Court to review other than Commerce's conclusory declarations." *Id.* Torrington claims that, in fact, (1) with respect to billing adjustment one, the record evidence confirms that Koyo could have reported amounts more precisely, and (2) with respect to billing adjustment two, the record evidence suggests that Koyo could have reported amounts more precisely for at least some of the adjustments. *See id.* (citing *Final Results*, 62 Fed. Reg. at 54,051).

Torrington further argues that Commerce's determination to accept certain home market discounts reported by NTN was not in accordance with law and not supported by substantial evidence. *See id.* at 3, 22-25. Specifically, Torrington claims that, as it did in the *Final Results*, *see* 62 Fed. Reg. at 54,050, based on two documents Commerce obtained at verification which related to the negotiation of certain discounts, NTN's reported discounts were not granted on a product- and customer-specific basis and suggests that they were likely applied to non-subject merchandise, *see* Torrington's Mem. Supp. Mot. J. Agency R. at 22-23. In addition, Torrington asserts that the record evidence demonstrates that discounts at issue were not discounts at all but, rather, were claims for rebates for which, Torrington contends, did not meet Commerce's standard for such an adjustment. *See id.* at 24-25. As such, Torrington claims that "the record and Commerce's description of the discounts were at odds, and Commerce has not articulated a rational connection between the facts found and the choice made." Torrington's Reply Br. at 7 (citation and internal quotation marks omitted).

Torrington, therefore, requests that this Court reverse Commerce's determination with respect to each subject adjustment and remand the case to Commerce with instructions to: (1)

disallow Koyo's downward home market billing adjustments, but allow all upward home market

billing adjustments in calculating NV; and (2) deny NTN's claimed adjustment for home market

discounts in calculating NV. *See* Reply Br. at 9-10.

Commerce responds that Torrington erred in relying on *Torrington CAFC* because the

case does not stand for the proposition that direct price adjustments may only be accepted when

they are reported on a transaction-specific basis. *See* Def.'s Mem. in Partial Opp'n to Mot. J.

Agency R. at 108. Rather, the *Torrington CAFC* court "merely overturned a prior Commerce

practice . . . of treating certain allocated price adjustments as indirect selling expenses," *id.* at 109

(citing *Torrington CAFC*, 82 F.3d at 1047-51), and "did not address the propriety of the

allocations methods that respondents used in reporting the price adjustments in question," *see id.*

at 109-10 (quoting *Final Results*, 62 Fed. Reg. at 54,050). Also, contrary to Torrington's

assertion regarding Commerce's position during the fifth administrative review, Commerce did

not consider *Torrington CAFC* as addressing proper allocation methodologies; rather,

Commerce, only viewed *Torrington CAFC* as holding that "Commerce could not treat indirect

selling expenses as improperly allocated price adjustments." *See id.* at 111. Indeed, Commerce

notes that this Court interpreted *Torrington CAFC* in *NSK Ltd. v. United States*, 969 F. Supp. 34,

43 (1997), in a manner consistent with Commerce's reading of the case in this review. *See id.* at

112. Commerce also notes that pursuant to its new methodology, it does not consider price

adjustments to be any type of selling expense, either direct or indirect, and, therefore,

Torrington's argument is not only without support, but also inapposite to *Torrington CAFC*. *See*

*id.* Moreover, Commerce asserts that this Court in *Timken* approved of Commerce's modified

methodology of accepting respondents claims for discounts, rebates and other billing adjustments as direct price adjustments, where this Court found the methodology to be consistent with requisites of 19 U.S.C. § 1677m(e).  *See id.* at 112-13 (citing *Timken*, 16 F. Supp. 2d at 1108).

Commerce also argues that its treatment of Koyo's reported home market billing adjustments and NTN's reported home market discounts as direct adjustments was supported by substantial record evidence and otherwise in accordance with law because it is consistent with *Timken*, that is, Commerce: (1) "used its acquired knowledge of the respondents' computer system and databases to conclude that they could not provide the information in the preferred form," and (2) "scrutinized the respondent's data before concluding that the data were reliable," and (3) found "that the adjustments on scope and non-scope merchandise did not result in unreasonable distortions."  *Id.* at 114.

In particular, with respect to Koyo's reported home market billing adjustment one, Commerce asserts that (1) given Koyo's record-keeping practices, (2) "in light of the fact Koyo limited its allocation to specific customers," and (3) that Koyo "avoided allocating adjustments granted on out-of-scope merchandise," Commerce's properly accepted the adjustment.  *Id.* at 115-16.  Commerce also argues it properly accepted billing adjustment two.  *See id.* at 117.  With regard to the first type of billing adjustment two, the lump-sum payment to customers, Commerce maintains that since these payments were not earned on particular sales, the best allocation for these payments was over all merchandise sold to the particular customer in question.  *See id.*  Commerce claims that "[t]he fact some of this merchandise was non-scope merchandise [had] no effect on the final amount apportioned to in-scope merchandise."  *Id.*  With

respect to the small portion of billing adjustment two consisting of model-specific adjustment for which Koyo had no computerized records, Commerce contends: (1) "in past reviews [it] has determined at verification that Koyo's records do not permit more accurate reporting"; and (2) "Koyo's in-scope merchandise was sufficiently similar to its other merchandise that there was little chance of distortion due to allocations across subject merchandise." *Id.* at 117.

Commerce also notes that in the sixth administrative review of AFBs, it verified the manner in which Koyo kept its normal records and confirmed Koyo's reporting for its billing adjustments was reasonable in light of its records. *See id.* at 119 (citing 62 Fed. Reg. at 2096). Commerce asserts that this is not an admission that Koyo could not accurately reports its prices generally, rather it merely was a finding that Koyo normally aggregated by customer certain price adjustments. *See id.* Further, Commerce claims that "the fact that Koyo could produce the supporting documentation which lay behind its aggregated record-keeping does not establish that it was unreasonable for Commerce to accept the allocated methodology used by Koyo in its records as maintained in the normal course of business." *Id.* Rather, Commerce maintains that, in reviewing reported allocations, it looks not only to what is theoretically possible, but what is consistent with § 1677m(e) and it also considers what is reasonable in light of the number of transactions involved and the possibility of unreasonable distortions. *See id.* Commerce argues that since Koyo's allocation for this POR was made on a customer-specific basis and did not raise a serious danger of distortion, it acted reasonably in accepting Koyo's billing adjustments. *See id.* at 119-20.

With respect to NTN's reported home market discounts, Commerce asserts that, contrary

to Torrington's contention, it verified that these discounts were granted on a customer-specific and product-specific basis, that is, across all sales to a customer of a particular class or kind of merchandise. *See id.* at 120. Thus, Commerce contends that "NTN properly attributed these discounts to the sales on which they were earned." *Id.* Commerce also claims, *inter alia*, that Torrington incorrectly characterizes NTN's billing adjustment at issue as a rebate. *See id.* at 123-25. Commerce notes that under its prior standard for determining whether to grant "an adjustment for a rebate, Commerce required evidence that the rebate 'program' was known to both parties at the time of the sale." *Id.* at 125 (citation omitted). Commerce, however, notes that NTN's reported home market discounts "do not constitute a rebate as that term was previously used by Commerce" because "[t]hey are class-or-kind specific price reductions negotiated with a specific customer" and, therefore, Torrington's contention based on Commerce's prior rebate standard should be disregarded. *Id.* Accordingly, Commerce asserts that since Commerce's treatment of NTN's home market discounts is supported by substantial evidence and is otherwise in accordance with law, it should be sustained. *See id.*

Koyo supports Commerce's position, asserting that its acceptance of home market billing adjustments one and two was in accordance with law and supported by substantial evidence. *See* Koyo's Mem. Supp. Mot. J. Agency R. at 2-3, 8-20. First, Koyo notes that pre-URAA judicial precedent does not prohibit Commerce's treatment of Koyo's billing adjustments as direct price adjustments, that is, the Court recognized in *Timken* that Commerce may reevaluate its treatment of PSPAs. *See id.* at 8-9 (citing *Timken*, 16 F. Supp. 2d at 1107). Thus, Koyo contends that "Torrington's argument that pre-URAA judicial precedent prohibits [Commerce] treatment of

PSPAs as price adjustments rather than expenses in the underlying review is no longer relevant."
*Id.* at 9.

Koyo also maintains that Commerce's change to a more liberalized reporting
methodology is consistent with the URAA and Commerce's new antidumping regulations. *See
id.* at 10-14. Koyo asserts that, as the Court recognized in *Timken*, Commerce's decision to
allow Koyo to treat its PSPAs as adjustments to price and allocate them is permissible under 19
U.S.C. § 1677m(e)'s more liberalized reporting instructions, which direct Commerce not to reject
data submissions once Commerce concludes that certain criteria are satisfied. *See id.* at 10-12.
Koyo further asserts that Commerce's treatment of allocated billing adjustments is also
consistent with the new antidumping regulation, 19 C.F.R. § 351.401(g)(1) (effective July 1,
1997), which permits Commerce to "'consider allocated expenses and price adjustments when
transaction-specific reporting is not feasible.'" *Id.* at 13 (quoting 19 C.F.R. § 351.401(g)(1)).
Koyo recognizes that although the regulations are not binding for this POR, it is nonetheless
informative as to Commerce's practice concerning the acceptance of allocated price adjustments
under the URAA, which govern this review. *See id.* at 13, n. 5.

Moreover, contrary to Torrington's assertion that even under Commerce's new reporting
methodology Koyo's PSPAs should be denied, Koyo argues that it acted to the best of its ability
in reporting billing adjustments one and two and that the reporting methodologies it employed
were non-distortive. *See id.* at 15. With respect to billing adjustment one, Koyo asserts that
given that the adjustment was allocated over only scope merchandise, and that the pool of scope
merchandise was similar in terms of value, physical characteristics, and the manner in which it is

sold, there is no reason to believe the adjustment resulted in unreasonable distortions. *See id.* at 16. Koyo also asserts that since this adjustment was allocated "over only scope merchandise, it would satisfy even the rigorous standard for allocation of an expense that this Court articulated under pre-URAA antidumping law." *Id.* Koyo further maintains that although Commerce did not use the specific language of "acted to the best of its ability" in the *Final Results* for billing adjustment one, Commerce found that it was not "feasible" for Koyo to either retrieve or allocate this adjustment more specifically and, thus, Commerce basically found that Koyo acted to the best of its ability. *See id.* at 17-18. With regard to billing adjustment two, Koyo claims that although the adjustment was allocated over scope and non-scope merchandise, the adjustment was proper because (1) it reported the adjustment in this manner because its records did not allow it to report it on a more specific basis, and (2) the allocation methodology for this adjustment did not have a distortive effect. *See id.* at 18-20.

Koyo further argues that in accepting billing adjustments one and two, Commerce did not, as Torrington maintains, shift the burden to the respondent seeking the price adjustment. *See id.* at 15. Rather, Koyo placed information on record, and based on that data, Commerce accepted Koyo's reported PSPAs, that is, Koyo met its burden of demonstrating eligibility for the adjustment according to the new reporting criteria approved under *Timken. See id.*

NTN asserts that Commerce correctly accepted its reported home market discounts as direct price adjustments to NV. *See* NTN's Resp. Br. at 4. First, NTN noted that, contrary to Torrington's allegation that two documents reviewed at verification contradict Commerce's determination that NTN's reported adjustments were discounts, Commerce based its finding of

no discrepancies in NTN's reported discounts after careful review and verification of numerous

documents, not just the two documents. *See id.* at 6. NTN further notes that the record

unequivocally establishes that its claimed adjustments were: (1) discounts, rather than rebates, as

Torrington alleges; (2) reported and granted on a customer- and product-specific basis; and (3)

applied to the subject merchandise. *See id.* at 6-8. In sum, NTN contends that Torrington's

allegations amount to nothing more than mere speculations and, therefore, Commerce's

allowance of NTN's reported home market discounts should be affirmed. *See id.*

NSK asserts that although Torrington claimed in its USCIT R. 56.2 motion that

Commerce erred by allowing allocated discounts and PSPAs in home market price calculations,

Torrington limited its argument to Koyo's reported home market billing adjustments and NTN's

reported home market discounts. *See* NSK's Opp'n to Torrington's Mot. J. Agency R. at 2.

NSK, therefore, argues that Torrington abandoned any challenge to Commerce's decision to

accept NSK's home market discounts or PSPAs and, thereby, the Court should sustain

Commerce's decision to apply such adjustments to NV. *See id.*

### C.    Analysis

The Court disagrees with Torrington that *Torrington CAFC* dictates that direct price

adjustments may only be accepted when they are reported on a transaction-specific basis.  Rather,

as Commerce correctly noted, the Court notes that *Torrington CAFC* "merely overturned a prior

Commerce practice . . . of treating certain allocated price adjustments as indirect selling

expenses," 82 F.3d at 1047-51, and "did not address the propriety of the allocation methods that

respondents used in reporting the price adjustments in question," *Final Results*, 62 Fed. Reg. at

54,050.  The Court further notes that *Torrington CAFC* was decided under pre-URAA law, that

is, it did not take into consideration the new statutory guidelines of 19 U.S.C. § 1677m(e).

Moreover, the Court acknowledged in *Timken* that although (1) "Commerce treated rebates and

billing adjustments as selling expenses in preceding reviews under pre-URAA law, and (2)

"previously decided that such adjustments are selling expenses and, therefore, should not be

treated in as adjustments to price," the Court nevertheless determined that this did not "preclude

Commerce's change in policy or this Court's reconsideration of it stance in light of the newly-

amended antidumping statute [(that is, 19 U.S.C. § 1677m(e))]."  16 F. Supp. 2d at 1107.

Indeed, the Court approved in *Timken* Commerce's modified methodology of accepting

claims for discounts, rebates and other billing adjustments as direct price adjustments to NV, *see*

*id.* at 1107-08, and reaffirmed its decision in *Torrington Co. v. United States* ("*Torrington CIT*"),

24 CIT __, Slip Op. 00-44 (Apr. 19, 2000).  Specifically, in *Timken*, the Court reasoned that

"[n]either the pre-URAA nor the newly-amended statutory language imposes standards

establishing the circumstances under which Commerce is to grant or deny adjustments to NV for

PSPAs." 16 F. Supp. 2d at 1108 (citing *Torrington CAFC*, 82 F.3d at 1048). The Court, however, noted that 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." *Id.* The Court, therefore, approved of Commerce's change in methodology, "as it substitutes a rigid rule with a more reasonable method that ensures that a respondent's information is reliable and verifiable. This is especially true in light of the more lenient statutory instructions of subsection 1677m(e)." *Id.*

Accordingly, the Court in *Timken* upheld Commerce's decision to accept Koyo's billing adjustments and rebates, "even though they were not reported on a transaction-specific basis and even though the allocations Koyo used included rebates on non-scope merchandise." *See id.* at 1106. Similarly, in *Torrington CIT*, the Court followed the rationale of *Timken* and upheld Commerce's determination to accept respondents' rebates even though they were reported on a customer-specific rather than transaction-specific basis and even though the allocation methodology used included rebates on non-scope merchandise. *See* 24 CIT at __, Slip Op. 00-44, at 13-16.

The Court finds that Commerce's decision to accept Koyo's reported home market billing adjustments and NTN's reported home market discounts was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA's statements. First, the record clearly indicates that Commerce properly used its acquired knowledge of the Koyo's computer system and databases to conclude that they could not provide the information

in the preferred form and, moreover, properly scrutinized Koyo's reported billing adjustments before concluding that the adjustments were reliable. Commerce also properly accepted Koyo's allocation methodology, even though it included adjustments on in-scope and out-of-scope merchandise, as it carefully reviewed the differences between such merchandise and ensured that the allocations were not unreasonably distortive. Also, the record clearly supports that NTN properly attributed its discounts to the sales on which they were earned and such adjustments were in fact discounts rather than rebates.

Moreover, the record and the *Final Results* demonstrate that the requirements of 19 U.S.C. § 1677m(e), as noted earlier, were satisfied by the respondents. First, Koyo's and NTN's reported adjustments were submitted in a timely fashion. *See* § 1677m(e)(1). Second, the information Koyo and NTN submitted was verified by Commerce. *See* § 1677m(e)(2). Third, the respondents' information was not so incomplete that it could not serve as a basis for reaching a determination. *See* § 1677m(e)(3). Fourth, Koyo and NTN demonstrated that they acted to the best of their abilities in providing the information and meeting Commerce's new reporting requirements. *See* § 1677m(e)(4). Although Commerce did not use the specific language of "acted to the best of its ability" in the *Final Results* with respect to billing adjustment one, the Court finds that Commerce's comment that it was not "feasible" to either retrieve or allocate the adjustment more specifically clearly raises the inference that Koyo acted to the best of its ability. Finally, the Court finds that there was no indication that the information was incapable of being used without undue difficulties. *See* § 1677m(e)(5).

Commerce's determinations with respect to Koyo was also consistent with the SAA. The Court agrees with Commerce's finding in the *Final Results* that given the extremely large volume of transactions, the level of detail contained in Koyo's normal accounting records, and time constraints imposed by the statute, Koyo's reporting and allocation methodology were reasonable. This is consistent with the SAA directive under § 1677m(e), which provides that Commerce "may take into account the circumstances of the party, including (but not limited to) the party's size, its accounting systems, and computer capabilities." SAA at 865. Thus, the Court finds that Commerce properly considered the ability of Koyo to report its billing adjustments on a more specific basis.

Accordingly, the Court concludes that Commerce's acceptance of Koyo's reported billing adjustments and NTN's home market discounts as direct adjustments to NV is supported by substantial evidence and fully in accordance with law. The Court also finds that since Torrington failed to raise a challenge to Commerce's decision to accept NSK's home market discounts or PSPAs, the Court sustains Commerce's decision to accept such adjustments.

## XIV. Other Issues

The Court has considered plaintiffs' and defendant-intervenors' other challenges to the *Final Results*, but finds them unpersuasive. Further, where parties have indicated in their briefs that their arguments for the instant matter are outlined in briefs submitted for related litigation pending before the Court, the Court declines to address such challenges. If a party wants consideration of its arguments, it should clearly articulate them in briefs submitted for the case at bar.

## CONCLUSION

For the foregoing reasons, the case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review; (2) make adjustments pursuant to 19 U.S.C. § 1677a(c) to § 1677a(a)'s starting price for determining EP; (3) make adjustments pursuant to § 1677a(c) and (d) to § 1677a(b)'s starting price for determining CEP; (4) articulate how the record supports its decision to recalculate NTN's home market indirect selling expenses without regard to LOT; (5) clarify how it complied with 19 U.S.C. §§ 1677e, 1677m by using facts available and applying an adverse inference with respect to NTN's alleged zero-price sample sales and, if Commerce determines that it conformed with the statutory framework, to include NTN sample sales in its United States sales database or, if Commerce determines it did not adhere to all of the statutory prerequisite conditions, to give NTN the opportunity to remedy or explain any deficiency regarding its sample sales; and (6) clarify whether NTN was provided with notice and opportunity to respond pursuant to § 1677m(d) with regard to its COP and CV data. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     June 5, 2000
           New York, New York

ERRATA

<u>NTN Bearing Corp. v. United States</u>, Consol. Court No. 97-10-01801, Slip-Op. 00-64, dated June 5, 2000.

Page 9, Line 16: ". . . but see Flora Trade Council v. United States . . ."
                              should be ". . . Floral . . ."

Page 25, Line 11: " . . . Final Results, Fed. Reg. at . . ." should be ". . . 62 Fed. Reg. . . ."

Page 26, Line 16: " . . . Final Results, Fed. Reg. at 54,053 . . ." should be " . . . 62 Fed. Reg. . . ."

Page 67, Line 3: " . . . to the bests of its ability . . ." should be ". . . best . . ."

Page 98, Line 14: " . . . or this Court's reconsideration of it stance . . ." should be " . . . its . . . "

October 11, 2000